### TILFORD v. BANK FOR SAVINGS et al.

(Supreme Court, Appellate Division, Second Department. June 7, 1898.)

GIFT CAUSA MORTIS—EVIDENCE.

    In an action to recover the amount of an alleged gift causa mortis, it appeared that the deceased was old, feeble, and dissipated, and very erratic; that he was under special obligations to his son, a defendant, for care in sickness, but had conceived a groundless ill will towards him, and had left his house, and gone to board with plaintiff, who had no claims on him. The testimony in support of the gift was weak, and the acts and declarations of the plaintiff immediately after the donor's death were inconsistent with such a gift. *Held*, on a review of the evidence, that it was not sufficient to prove the gift.

Appeal from special term, Kings county.

Action by Mary Tilford against the Bank for Savings and others. From a judgment in favor of plaintiff, defendants appeal. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, HATCH, and WOODWARD, JJ.

Charles M. Earle, for appellants.

Jesse W. Johnson (Albert E. Lamb, on brief), for respondent.

HATCH, J. Upon the trial the court found that there was a valid gift to the plaintiff, causa mortis, by the delivery of the bank book representing the moneys on deposit in the bank issuing the same. The court made a general decision, without stating separately the facts found. Under the exception filed to such decision, we are required to review all questions of fact and law presented by the record. Code Civ. Proc. § 1022.

The rule of law which governs the disposition of cases involving gifts inter vivos and causa mortis, so far as cogency of proof is concerned, is somewhat different from the strength of evidence usually found sufficient for the establishment of contracts, the rights of parties arising thereunder, and of other similar questions. The reason for this rule is found in the fact that fraud may be quite easily perpetrated, that weakness and uncertainty of will are often attendant upon the donor, and temptation to construe an act and circumstances into a gift, by reason of interest, presses strongly upon the donee. For these and other reasons the courts have uni-

formly hedged about the establishment of these gifts somewhat unusual requirements, and have insisted that the proof in support thereof shall be strong, clear, and conclusive. "In many of such cases there is great danger of fraud, and all the books concede that the evidence which proves the gift should be clear and convincing, strong, and satisfactory. Although it may not be true that the law presumes. against a gift, it certainly does not presume in its favor, but requires proof of it. Grey v. Grey, 47 N. Y. 552; Grymes v. Hone, 49 N. Y. 17; Lewis v. Merritt, 113 N. Y. 386, 21 N. E. 141." Devlin v. Bank, 125 N. Y. 756, 26 N. E. 744. "Whoever alleges a gift must prove it satisfactorily. A doubtful case will not do." Doty v. Willson, 47 N. Y. 580. "As there is great danger of fraud in this sort of gift,. courts cannot be too cautious in requiring clear proof of the transaction. This has been the rule from the early days of the civil law (which required five witnesses to such a gift) down to the present time." Grymes v. Hone, 49 N. Y. 17. "Whoever alleges a gift must establish it by satisfactory proof. Where the matter is left in doubt upon the whole case, the case must fail." In re Rogers, 10 App. Div. 593, 42 N. Y. Supp. 133.

Applying these rules to the evidence in this case brings us to the conclusion that the plaintiff has failed to meet the requirement, and that the testimony offered fails in fairly supporting the conclusion reached by the learned trial court. In applying the evidence and making disposition of the case it is proper that we take a general survey of the claimants to the fund, and their relation to the deceased,. and the deceased himself.

The plaintiff is a married woman, the wife of Alexander Tilford, a machinist. Neither wife nor husband was in any wise related to. the deceased, and, so far as is disclosed by the record, had no acquaintance with him until he went to their home to board, on the 1st day of February, 1896, where he continued until the 5th day of October, when he died. The deceased paid Mrs. Tilford five dollars a week for his board, and this sum seems to have been ample. compensation for all the services which were rendered in caring for. the deceased during that period of time. The deceased seemed to. require but little care and attention during this period, and the. care and attention which he did require were of quite a simple character. The defendant McElwee is a son of the deceased. In October, 1893, he came to live with his son. Prior thereto the deceased had met with an accident in which he had broken his jaw, arm, and nose and lacerated his head. He had been taken to a. hospital, and was removed therefrom to his son's house, where he. remained in bed and under the doctor's care for about two months. During this time he required a muzzle to keep his jaw in place; was unable to feed himself; could only take liquid food, which was fed. to him with a spoon; and he required constant care in cleansing his. mouth, keeping the supports in place, and otherwise nursing him. The condition of his mouth was quite offensive, requiring constant care in spraying with an antiseptic dressing, and nursing him was a disagreeable duty. The defendant McElwee was kept from his business in attendance upon the deceased, and does not seem to have.

omitted anything which was requisite for his proper care. The deceased continued to reside with his son up to February, 1896, when he left his house, and went to board with the plaintiff. It does not appear that the deceased paid anything to his son for the care which he received or for his board, or that he was expected to pay anything. Neither does it appear that the parties had any difficulty during this period, except that the son, shortly before his father left his house, objected to having liquor in the house, and objected upon one occasion to the father's sending his boy of tender years for liquor. There is some testimony of declarations made by the deceased to several witnesses that he was not happy at his son's house; that he did not receive proper attention, or get enough to eat; and that he did not intend to give him any of his money, or more than a dollar, "through the law." Aside from these declarations, there is no testimony that he did not receive proper care and attention at the son's house, while the testimony is abundant to show that during his illness he received the best of care, and it is quite probable that such care so continued after his recovery and until he left. Indeed, the case is destitute of any proof that he had any difficulty with the son aside from the remonstrance as to the liquor, up to the time when he left the son's house. The testimony is entirely satisfactory in establishment of the fact that the deceased was of an irascible temperament, and that his irascibility grew upon him; that without cause or provocation he would rise from table when at meals, leave the room, and slam the door; that he would suddenly and without cause break off a conversation, and act in an excitable manner, without occasion for it. The physician who attended him at the son's house testified that after his recovery his physical condition was good, "but his mental not so well. He would become erratic. His mind would wander at times,—occasionally. I have seen him become very impulsive—very excitable—at times when there was no occasion for it. I had conversations with him. Mentally he sometimes would act a little imbecile; at other times he would act rational. He would at times be talking on a subject,—go right on to something else. He would be very quarrelsome at times. He would get up in his seat and walk around, and not want to talk to anybody, and in fifteen minutes he would come back to himself, and would be all right again. Quarrelsome at times; very irritable; very nervous." He also spoke to this physician about drawing his will, but said nothing about disinheriting his son. This witness was asked: "From what you know of his mental and his general condition, was he a man that was easily led?" This was objected to upon the ground "that witness cannot testify as to that, even as an expert." The objection was sustained, and the defendant excepted. Another physician testified that he saw and examined the deceased in the winter of 1893–94. "I found that he was suffering from mental and nervous enfeeblement. He acted peculiarly irritable. I might fill a volume, almost, to detail it." This witness was asked and permitted to testify that the condition of mind in which he found deceased would lead him to be "easily influenced and persuaded." If this testimony was competent, and we think it was, the ruling pre-

ceding it was wrong. There was other testimony by late witnesses tending to corroborate this testimony. It appears without dispute that, after the deceased left his son's house, he drank much more than while he remained with him; that the plaintiff gave him liquor, as he called for it, mostly in the form of milk punches, but in any form or quantity as the deceased wished. The physician who attended him at the son's house stated in this connection that he saw him on October 2, 1896, three days before his death, and had seen him several times while at plaintiff's house. He states his condition in these words:

"His general appearance during the time he was at Mrs. Tilford's, there was waste going on. The man was suffering with debility of some kind. He was losing ground. I noticed he had been drinking. You could see it by his appearance and general condition, that he was overstimulated. * * * She [plaintiff] said she gave him milk punches,—gave him what he wanted. She said he didn't care to eat much,—did not appear to have any appetite. She said once in a while he took a pint of lager, and sometimes she gave him milk punch and whisky and milk. She said she got him milk punches and beer whenever he wanted it. His appearance indicated he was a very dissipated man. He was very much emaciated and debilitated."

This physician attended him on the 2d, 3d, and 4th of October before his death. He was called again after his death, and, in response to this call, was informed that Dr. Hartung had been asked in on an urgent call, as the deceased thought he would try another doctor; and, when he asked why he was called two hours after death, the plaintiff replied, "I thought he might be living yet." None of these statements were denied by the plaintiff.

Upon this testimony the court felt constrained to say that he "should assume he [deceased] left that [son's] house because he could not get liquor there." We quite agree with the learned court in this view of the proof, and are convinced that the testimony clearly establishes that this was the reason why the deceased left the son's house. It is easy to see that the mental condition of the deceased was affected, and doubtless was aggravated, by the excessive use of liquor, and that such condition might prompt him to disinherit his son. It is not sufficient, however, to establish mental incompetency to make a gift, but does impose upon the court the duty of a very careful scrutiny of the proof relied upon to establish it, and is relevant upon the question of intent and understanding in determining the purpose of the deceased, and in the weight to be attached to the testimony as a whole. That the deceased felt unkindly towards the son is apparent, occasioned mainly, in all probability, by the opposition of the son to his father's use of liquor, and the appearance before the magistrate, which probably arose out of it.

We have disclosed the relative relations of the parties in order to get a clear view before applying ourselves to a review of the evidence upon which rests the finding of the court. The diversion of the property from the son by the father, to a stranger, is repugnant to the natural claim of affection, and is so far unusual that courts adopt belief in such intention with hesitancy. We do not deny that such purpose may exist, and that it may be evidenced quite satisfactorily; and if the donor intends to thus dispose of his property, is

legally capable of forming such intention, and has made the same effectual by actual delivery, it must be upheld. Under the circumstances presented by this record, such result must rest upon no uncertain case, and proof, before it can be deemed preponderating, must be clear, strong, and satisfactory.

This brings us to a consideration of the evidence which is relied upon to establish and support the gift in the present case. It rests mainly upon the testimony of Samuel Goodbody, Alexander Tilford, the husband of the plaintiff, and Elizabeth Galt. Goodbody had known the deceased for about two years, and had met him socially about once in two weeks during that time. He testified that on the night before the death of deceased he met him, and was requested by him to see about his burial. The deceased requested a drink of water, and Tilford went for it. In his absence, the deceased took from under his pillow an envelope, and handed it to Mrs. Tilford, saying, "Here, mother, this is for you, and see that I am buried;" and he said to the witness, "Good-by, Goodbody, you take charge of my remains when I die;" "and he says, 'The balance of the money will pay you for your trouble and kindness towards me.' Q. Pay who for the trouble? A. Mrs. Tilford. I saw the book. This is the envelope. Mrs. Tilford took out the book. I couldn't say whether this is the book. I guess that is it. This is the one she took down to the lawyer, I guess. I was present when she took it to the lawyer. I went along. She took the book— Mr. Tilford returned. * * * When he returned the old gentleman said to Mr. Tilford, * * * 'I done the right thing with mother;' * * * and she showed him the bank book. * * * That is about all I can remember him saying." Tilford, the husband, testified that deceased said: " 'I have made mother all right, anyhow, Boss.' * * * Says I, 'Why?' She had the bank book in her hand, and he says, 'I presented her with that bank book, and that is for the good keeping that she has done with me.' " Elizabeth Galt testified that on the first day deceased went to board with plaintiff he gave her the bank book. "He told her to keep it for him, and, in the event of his death, it was hers. She said she did not want this money; that he should put it in an institution, if he wished. He said, 'No; he wished her to have it.' "

It is to be noticed that the complaint is framed upon the sole theory that the gift in this case was a gift causa mortis, and was consummated a short time before the death of the deceased. The testimony of the witness Galt was incompetent for the purpose of establishing such a gift as was pleaded, as her testimony only tended to establish a gift inter vivos, and it was not effectual for any other purpose. Curry v. Powers, 70 N. Y. 212. It was also strong testimony, not only against the theory of the complaint, but also against the claim of a gift causa mortis; for it was claimed by the plaintiff that she never had possession of the bank book prior to the time when it was delivered to her by the deceased on the night before his death, and this testimony tended to show that it was delivered before, and would therefore account for the possession of the book in plaintiff's hands without any gift being intended. This testimony was admitted for a

limited purpose, i. e., as bearing upon the probability of the gift causa mortis. It is difficult to see how it operated to that end, except as it might show a disposition to make a gift. Its effect, however, as a whole, is opposed to the theory of the plaintiff as now relied upon. The testimony of the witness Goodbody leaves the matter in a state of doubt as to whether he had an interest in the funds represented by the book, to the extent of the charge for funeral expenses, or whether the plaintiff was to pay him from the book. That the expenses of the burial were to be paid by Goodbody is quite consistent with his testimony, and that he was to receive the money from the sum represented by the book is clear. But whether plaintiff was to pay or Goodbody was to take from the funds this sum is not clear. The deceased gave no direction about that, and the matter is left to inference. If plaintiff was to pay, then it was not a gift of the whole, and therefore not a gift of the book or the sum secured thereby; and it is not clear that such a gift could be sustained, or that it operated as such. Curry v. Powers, supra.

So far as the testimony of the husband is concerned, it is, by reason of his relation to the plaintiff, the subject of suspicion; and, if the case depended upon the testimony of the husband alone, the court might well hesitate in upholding the gift. Ridden v. Thrall, 125 N. Y. 572, 26 N. E. 627. If, however, this were all there was of the case, we might conclude that this evidence, coupled with the possession of the bank book, the declarations testified to by other witnesses of an intent to give plaintiff the money, and of a desire to deprive the son of any portion of it, would be sufficient to support the judgment which has been rendered. But such a state of facts is far from being the case. The physician who attended the deceased, and who appears to have been a disinterested witness, testified that on the morning of the death of the deceased he had a conversation with the plaintiff, in which she stated: "It was too bad there was no will made. She said she would put in a bill for five hundred dollars for nursing him. I was alone with her at the time. She said she was in' possession of the bank book. I think she said there were two others that she did not have, but she knew of them." In addition to this was the testimony of Ward B. Smith, a police officer, who was present at the house on the day following the death. He testified that he heard a conversation between McCaffrey, a lawyer who represented the defendant McElwee, and the plaintiff and Goodbody, when a demand was made for the body of the deceased and the bank books and a pawn ticket; and plaintiff, in response, said "she knew nothing of any pawn ticket or any bank books; that, if there was anything left by the old man, it belonged to him, and that he could have it; that she would be glad to get rid of the body and the trouble of burying the old man." And further she said: "Why make a fuss? If there is anything left by the old man, it is yours, pointing to McElwee, Jr." This witness further testified that Goodbody said: "If the old man had lived one day longer, there would have been a will made, and you [pointing to John McElwee, Jr.] would be cut off with one dollar." John W. Earl, the undertaker who prepared the deceased for burial, was present at the conversation above referred to,

and testified that Goodbody stated in his presence that "if Mr. McElwee, Sr., had lived twenty-four hours longer, he would cut off Mr. McElwee; make a will, and cut him off with a dollar." Mary McElwee, a daughter of the defendant McElwee, testified that she was present at such conversation, and heard McCaffrey "ask Mrs. Tilford if the body owed her anything, and she said, 'No; that body does not owe a single cent;' and then Mr. Goodbody said, 'If the old man had lived one day longer, there would have been a will made out, leaving you with only one dollar.'" McCaffrey was called as a witness for the plaintiff. He testified that he went with the defendant McElwee to make a demand for the body for purposes of burial. In the course of the conversation the defendant McElwee said to the plaintiff, "We want those bank books and pawn ticket;" and plaintiff replied: "There is one bank book. I have given it to my attorney, Mr. Rockwell. He has it now. If you want to find out anything about that, you may go and see him." He was asked specifically if the plaintiff did not say to McElwee, Jr., that "the money would be all yours," and replied that he did not recall any such remark. He further testified that he asked plaintiff if Mr. McElwee, Sr., owed her anything, and she replied, "No; that he had paid his board." He denied asking her if there were any charges on the body. He was asked if she did not state that "the money is all yours or anything of that kind," and replied that he did not remember any such thing being said, but remarked that that was a matter for subsequent consideration. He was asked if Mr. Goodbody stated "that if Mr. McElwee had lived one day more there would have been a will made by which Mr. McElwee, Jr., would have been cut off without a cent, or with a cent," and replied: "There was something said about a will; there was to that effect. I paid very little attention to it. I will not be positive as to who said it. My impression is it was stated by some male participant in the conversation."

It is quite evident, taking this testimony as a whole, coupled with the other circumstances of the case, that the plaintiff has failed to sustain the burden of proof which rested upon her. The fair preponderance of testimony in respect of the declarations which were made by the plaintiff and Goodbody, which have been already adverted to, establishes that immediately following the death of the old man they took a position entirely inconsistent and irreconcilable with the fact that any gift causa mortis had been made. At least, we may go to the extent of saying, which is all that is needful for the present disposition of this case, that the evidence of the plaintiff of a gift is so far discredited as to cause a strong misgiving in the mind that any gift was made as claimed by the plaintiff. Taking all the evidence together, it is not too much to say that the proof in support of the gift is not of that clear, convincing, and satisfactory character which is essential, under the law of this state, to uphold and give effect to this transaction as a gift causa mortis. We are therefore led to the conclusion that the finding of the court is not supported by the testimony.

The judgment should be reversed, and a new trial granted, costs to abide the final award of costs. All concur.