[Civ. No. 30453. First Dist., Div. One. May 31, 1974.]

STANFORD W. ASCHERMAN, Plaintiff and Appellant, v.
SAN FRANCISCO MEDICAL SOCIETY et al.,
Defendants and Respondents.

## Counsel

Slaff, Mosk & Rudman and Edward Mosk for Plaintiff and Appellant.

Lamb & Glynn, Robert L. Lamb, Hassard, Bonnington, Rogers & Huber, Alan L. Bonnington, Richard G. Logan, Crosby, Heafey, Roach & May and Chris Gasparich for Defendants and Respondents.

## Opinion

**SIMS, Acting P. J.**—Plaintiff, a licensed and practicing physician has appealed from four separate judgments entered in favor of three groups of defendants[1] in an action in which he sought (1) to enjoin all of the

---

[1]One judgment was entered in favor of defendants San Francisco Medical Society and Eugene W. Webb, M.D., its president. A second judgment was entered in favor of defendants American Society of Internal Medicine, Malcolm S. M. Watts, M.D., past president of the San Francisco Medical Society and chairman of the public relations committee of the American Society of Internal Medicine, and Albert B. Whitehall, the executive director of the latter society. The plaintiff filed one notice of appeal from each of the above judgments and joined in it an appeal from a judgment, actually entered but not a part of the record, in favor of defendant Direct Wire Telephone Service Company, an answering and referral service used by the San Francisco Medical Society, and defendant Marguerite Nevitsky, the manager of that service. These defendants, who are all represented by the same attorneys will be collectively referred

defendants from conspiring together so as to prevent or interfere with the plaintiff in the practice of his profession in the manner in which the plaintiff alleged the defendants had conspired so to do, (2) to enjoin certain defendant hospitals and their operators from excluding the plaintiff from their respective staffs or from the use of their respective facilities, (3) compensatory damages for alleged interference with plaintiff's practice in the sum of $1,000,000 and (4) exemplary damages of $5,000,000.

The judgments were entered by the court pursuant to the provisions of section 630 of the Code of Civil Procedure[2] after the jury was discharged because it could not arrive at a verdict. Plaintiff's basic contention is that the court erred in granting the defendants' motions for judgment, because the evidence was sufficient to sustain a judgment in his favor on the theory that the defendants, and each of them, joined together at various times to tortiously interfere with and to deprive him of

to as the medical society defendants. Originally included in this group were defendants G. Tod Bates, allegedly the assistant executive secretary of the American Society of Internal Medicine, and Olive Neick, the executive secretary of the San Francisco Medical Society. Bates died during the pendency of the action and it was dismissed as to him. Defendant Neick, who was originally served as a fictitious defendant, joined in the answer of the other medical society defendants to the second amended complaint and an amendment thereto, and was represented at the pretrial conference by the attorneys for those defendants. According to the medical society defendants, an order was made sustaining her demurrer to the amendment to the second amended complaint and she was no longer a party at the time of trial.

A third judgment was entered in favor of defendant American Mutual Liability Insurance Company, a liability insurer that offered malpractice insurance to members of the San Francisco Medical Society. The plaintiff filed a notice of appeal from that judgment. The action was ultimately dismissed as to its general manager, the defendant Thomas Hadfield, who died November 5, 1967.

A fourth judgment was entered in favor of defendants Franklin Hospital, O. W. Jones, M.D., its chief of staff, Edmond D. Butler, M.D., its chief of surgery, Frederick S. Howard, M.D., chairman of its credentials committee, and George D. Monardo, its administrator; St. Joseph's Hospital, and Harold H. Lindner, M.D., its chief of surgery; Hahnemann Hospital, and Morris Groper, M.D., its chief of surgery; and French Hospital. This judgment in favor of those defendants, who will be referred to collectively as the hospital defendants, recites, "It is further ordered, adjudged and decreed that judgment be entered in favor of said defendants [naming them], and each of them, individually, and against plaintiff . . . on the first cause of action of said plaintiff's complaint, and on the second, third, fourth, fifth, sixth, seventh, eighth, ninth, and tenth causes of action of said plaintiff's complaint, insofar as said second, third, fourth, fifth, sixth, seventh, eighth, ninth and tenth causes of action, seek to recover money damages. Said defendants are awarded their costs of suit." This judgment is the subject of plaintiff's third notice of appeal.

[2]This section reads in part: "When a motion for a directed verdict, which should have been granted, has been denied or for any reason not granted, and the jury for any reason, has been discharged without having rendered a verdict, then within 10 days after the discharge of the jury, the court on its own motion, or, after said 10-day period, upon motion, notice of which was given within said 10-day period, may order judgment to be entered in accordance with the motion for a directed verdict . . . ."

his right to follow his profession. Inherent in the foregoing contention is the proper delineation of the rights of the plaintiff with respect to practice in the hospitals. As indicated below the plaintiff claimed that each of the hospitals, in either dismissing him from its staff, or refusing him admission to its staff, or in refusing him the use of its facilities, denied him due process of law and acted improperly in failing to take appropriate proceedings under its bylaws. The plaintiff contends that the court erred not only in withdrawing these claims from consideration by the jury, but also in improperly instructing the jury that they were not to consider such matters. Plaintiff alleges that further error was committed in charging the jury that compliance with the provisions of section 43.7 of the Civil Code[3] would exonerate the physician defendants because that section is unconstitutional, and that the court improperly admitted prejudicial testimony regarding alleged mismanagement of surgical cases by the plaintiff.

It is concluded that the power of a nonprofit hospital, whether public or private, to pass on an application for appointment to or renewal of staff membership is a fiduciary power to be exercised reasonably and for the public good; that the applying physician is entitled to minimal due process of law protection; that the trial court erred in instructing the jury that it should not concern itself with whether or not the hospitals in failing to reappoint or to appoint the plaintiff had violated certain principles of law, and that the hospitals were not required to give him a hearing or give him any reason for their action. Furthermore, the court erred in instructing the jury that there was no issue concerning the question of whether any of the hospitals failed to comply with its bylaws, and that there was no necessity for a hearing if the bylaws did not so provide. The

---

[3]This section reads and read at the time of the amendments to the answers and trial: "There shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any member of a duly appointed committee of a state or local professional society, or duly appointed member of a committee of a medical staff of a licensed hospital (provided the medical staff operates pursuant to written bylaws that have been approved by the governing board of the hospital), for any act or proceeding undertaken or performed within the scope of the functions of any such committee which is formed to maintain the professional standards of the society established by its bylaws, if such committee member acts without malice, has made a reasonable effort to obtain the facts of the matter as to which he acts, and acts in reasonable belief that the action taken by him is warranted by the facts known to him after such reasonable effort to obtain facts. 'Professional society' includes . . . medical, . . . organizations having as members at least a majority of the eligible licentiates in the area served by the particular society. The provisions of this section do not affect the official immunity of an officer or employee of a public corporation.

"This section shall not be construed to confer immunity from liability on any professional society or hospital. In any case in which, but for the enactment of the preceding provisions of this section, a cause of action would arise against a hospital or professional society, such cause of action shall exist as if the preceding provisions of this section had not been enacted."

errors in instructing were prejudicial with respect to plaintiff's case against the hospital defendants. Although the court properly ordered judgment with respect to defendants American Society of Internal Medicine, Watts, Whitehall, Direct Wire Telephone Service Co., Novitsky, Webb, and American Mutual Liability Insurance Company, it erred in ordering judgment for the hospital defendants, and the local medical society. The provisions of section 43.7 of the Civil Code are constitutional, but their application to this case depends on the resolution of factual issues, and they do not absolve the doctor participating in the hospital's decisions as a matter of law. The court properly admitted expert hindsight of certain cases, but failed to limit its consideration to the question of his right to recover damages. The judgments must be reversed as to the local medical society and the hospital defendants, and affirmed as to the remaining defendants.

The first cause of action in plaintiff's second amended complaint for injunction and damages alleges that a conspiracy was entered into and joined by, all of the named defendants for the purpose of injuring the plaintiff in his professional reputation and in his profession of physician and surgeon; that the conspirators caused plaintiff to be dropped from the medical staffs and to be denied access to the facilities of certain named hospital defendants, to be denied liability insurance from the defendant insurer, to be denied the referrals which would otherwise have been made by the medical society's telephone referral service, all to his damage as prayed for in the complaint.

The second cause of action alleged that defendants Franklin Hospital, Monardo, Butler, Jones, and Howard had maliciously and oppressively deprived plaintiff of staff membership without due process of law; the third alleged that defendants at Franklin Hospital had failed to follow their bylaws in dismissing plaintiff from the hospital; and the fourth alleged that Dr. Butler, as chief of the department of surgery at Franklin Hospital had arbitrarily, capriciously and maliciously injured plaintiff in his profession by making false charges in securing the dismissal of plaintiff from the hospital.

The fifth cause of action alleged that defendants St. Joseph's Hospital and Dr. Lindner, its chief of surgery, and various agents maliciously and oppressively dismissed plaintiff from the staff of St. Joseph's without due process of law; and the sixth alleges that the foregoing defendants failed to follow the bylaws of St. Joseph's in dismissing plaintiff from the staff.

The seventh cause of action alleges that the Homeopathic Foundation,

doing business as Hahnemann Hospital, at the insistence of Dr. Groper, the chief of surgery at Hahnemann Hospital, failed to accord plaintiff due process of law in dismissing him from the staff, and the eighth claims that the Hahnemann Hospital and its agents failed to follow its by-laws in dismissing plaintiff from the staff.

The ninth cause of action claims that French Hospital failed to accord plaintiff due process of law in considering his application for staff privileges, and in the tenth cause, it is claimed that French Hospital did not follow its own bylaws in rejecting his application for privileges.

Answers were filed on April 9, 1965, by defendants Hahnemann Hospital, and Monardo, Jones, Groper, Butler, Lindner, and Howard denying the material allegations of the complaint, contending that the bylaws had not been violated, nor were they required to give plaintiff any rights other than those contained in the bylaws, and raising various defenses. In 1965 the five physician hospital-defendants subsequently amended their answers, pursuant to a court order, to raise the additional defense of the provisions of Civil Code section 43.7. (See fn. 3 above.)

Other defendants then demurred to the conspiracy count. The demurrers were sustained without leave to amend and plaintiff appealed. On July 3, 1968, in an unpublished opinion this court (1 Civ. 23673, Div. Four) held that wrongful or malicious interference with the pursuit of a lawful business or occupation constitutes a tort, and rejected the claim that "in order to maintain professional standards and medical care of high quality, private hospitals and their staffs must have absolute discretion to exclude doctors from membership, without possibility of suit for damages resulting from the exclusion. . . ." The court reversed the judgments of dismissal and ordered the lower court to rule on the special demurrers.

In May 1969, the medical society defendants filed an answer to the second amended complaint and the amendment to the second amended complaint. The insurer filed an answer in the same month and the hospital defendants filed a further answer in July.

Trial by jury began on November 2, 1970, and motions for a nonsuit and for a directed verdict on behalf of all defendants were denied. Jury deliberations began December 3. On December 4 the jurors advised the court they were divided six and six and could not reach a verdict, and they were discharged. On December 30 defendants' motions for judgments under Code of Civil Procedure section 630 were granted. Thereafter the judgments appealed from were entered (see fn. 1 above) and this appeal ensued.

The general evidence of plaintiff applicable to all issues is as follows: Plaintiff was born in Chicago, where his father was a physician for 50 years. He graduated from Stanford in 1946 with a Bachelor of Arts Degree, received a Bachelor of Science Degree at the University of Illinois in 1948, and graduated from the University of Illinois College of Medicine in 1950 at the age of 23. He then served his internship and residence at Cook County Hospital from 1950 through 1952 and followed this with surgery training at the Bellevue Hospital, Columbia University Division, in New York until 1953. He then was assistant resident in surgery at the Mount Sinai Hospital of New York City until 1954 when he became chief resident in surgery until 1956 at the Bronx Municipal Hospital, which is part of the Mount Sinai College of Medicine. Plaintiff then entered the United States Air Force Medical Corps, was honorably discharged in 1959, and entered private practice in San Francisco.

Plaintiff has written three articles for medical journals, one in 1953, one in 1958 and one in 1960. He is also a diplomate of the American Board of Surgery in which membership is not open to all surgeons, but is contingent upon a period of formulated training, followed by written and oral examinations.

When plaintiff came to San Francisco and began private medical practice in 1959, he was a relative stranger in the community. He immediately joined the San Francisco Medical Society and then received a copy of a letter informing him that they had a referral service for persons who did not have doctors and urging him to join the service. After receiving the letter, the doctor filled out an information card for the referral service and began receiving patients from the service.

Defendant Direct Wire Telephone Answering Service maintained the service for the San Francisco Medical Society, taking emergency calls during the hours that the society was closed. All instructions on the method of handling the calls came orally from the medical society. During 1959, 1960 and 1961, plaintiff relied substantially upon these referrals to build his practice. Practically each day when he left his office, he notified the answering service that he was available to take calls and did the same thing almost every weekend.

During this period of time, hardly a night went by that he did not receive one or two calls from the answering service, usually between the hours of midnight and 7 a.m. Of these calls, approximately 50 percent paid for their services and 50 percent were charity patients or did not pay. About 10 to 20 percent of the callers remained patients of the doctor in

later years, the remainder were one-time visitors. Evidence showed that in 1959, plaintiff's gross income was $14,515.08; in 1960 it increased to $34,378.95; and in 1961 it grew to $40,027.89.

Plaintiff's position is that certain key events occurred in 1961 and 1962, following an incident at the Union League and Press Club of which he was a member and on whose admission committee he sat, and these events injured him professionally. Defendants' account of these events will be presented in conjunction with the discussion of the issues.

During 1961 and 1962, the plaintiff was openly advocating a federally financed medical care program which has since become known as Medicare. On January 9, 1962, defendant Whitehall, the new executive director of the American Society for Internal Medicine was recommended by Bates for membership in the Union League and Press Club. (Hereafter merely Press Club.) Whitehall produced a newsletter of his organization at the Press Club membership meeting in support of that application. Plaintiff objected that the publication indicated that the American Society for Internal Medicine was just a lobbying group for those opposing Medicare and also questioned the *bona fides* of the organization. Whitehall and Bates said they did not have to "take this kind of insult" and walked out of the room.

Subsequently the following events occurred:

A. Plaintiff received a letter dated January 12, 1962, from defendant Dr. Watts, the immediate past president of the San Francisco Medical Society and a trustee and chairman of the public relations committee of the American Society of Internal Medicine, demanding an apology from the plaintiff. A copy of this letter was addressed to defendant Dr. Webb, newly elected president of the San Francisco Medical Society.

B. In a letter dated January 19, 1962, Webb wrote to Watts agreeing that plaintiff should apologize and suggesting that Watts bring plaintiff's "breach of professional conduct" up with the professional relations committee of the San Francisco Medical Society.

C. Franklin Hospital through its administrator, defendant Monardo, notified plaintiff by a letter dated January 19, 1962, that he would not be reappointed to staff privileges for the coming year pursuant to the instructions of the financial committee of the Board of Trustees.

D. In January or February of 1962, plaintiff learned from a patient that sometime in January he had not been reappointed to the staff of St. Joseph's Hospital, on which he had served for more than two years.

E. By a letter dated March 7, 1962, the doctor was informed that he was not reappointed to the medical staff at Hahnemann Hospital in accordance with action by the executive committee of the medical staff, on which staff he had served for more than two years.

F. Plaintiff received a temporary appointment to the staff at French Hospital in February of 1962, but this appointment was terminated in May of 1962.

G. By a letter dated May 14, 1962, plaintiff requested the San Francisco Medical Society committee of professional relations to investigate the circumstances surrounding his loss of all hospital facilities at Franklin, St. Joseph's and Hahnemann.

H. On May 28, 1962, plaintiff was denied medical malpractice insurance by the defendant insurance company in a letter by Thomas Hadfield, the general manager, which letter did not explain why the denial occurred. The rejection rate for such applications was 1 percent.

I. After June 6, 1962, and without any notice or explanation to him, plaintiff ceased receiving referrals from the answering service of the San Francisco Medical Society.

J. The executive secretary of the society, defendant Neick, admitted that she told defendant Novitsky, the manager of the Direct Wire Answering Service to remove plaintiff's name from the active list of doctors receiving referrals.

Plaintiff found that the only facility available to him in San Francisco for carrying on his practice as a surgeon was Polyclinic Hospital, a small, unaccredited proprietary hospital, whose facilities were less adequate than those of other San Francisco hospitals. The doctor sought facilities at other hospitals but had very little success.

Plaintiff no longer received professional referrals from other doctors and lost patient referrals because many patients would not go to Polyclinic. He estimated his loss of business between 1962 and 1966 as 10 percent. His gross income in 1962 dropped to $36,956.84 but rebounded to $46,422.58 in 1963.

In 1966, plaintiff was suspended from the staff at Polyclinic until such time as his litigation (this action and others) was completed and he was able to devote adequate time to his practice. Thereafter he had hospital facilities only at Sequoia Hospital in Redwood City, about 35 or 40 miles from San Francisco, and Peninsula Hospital in Burlingame. Both of these hospitals were first-rate, but their locations presented a tremendous burden

to the doctor and his patients. It was necessary for him to make as many as three round trips per day to Redwood City, between 5 o'clock in the morning until late at night in order to properly care for his patients. He lost patients who would not travel that far because it was difficult for their families to visit their hospitals. Frequently plaintiff had to drive relatives personally to visit his patients in the hospitals; and if a patient had a serious and immediate problem, he could not jeopardize the life of the patient to drive that far and would have to relinquish the patient to a doctor with hospital facilities closer to the center of the city. Ambulance services for patients were more expensive, frequently resulting in bills from $80 to $100.

Plaintiff found he could not devote as much time to professional writing and professional activities in the academic sphere since some four to six hours daily were devoted simply to travel. He lost at least another 10 percent of his potential practice after 1966.

Other losses to plaintiff consisted of professional advantages from major staff hospitals like Franklin, St. Joseph's or Hahnemann, including attendance at seminars, educational programs, committee meetings and similar activities, all of which he had always attended while on their staffs. His relationships with other doctors, both educational and financial were adversely affected by his severance from these hospitals. Prior to his removal from the staffs of the hospitals, he had received many referrals from other doctors, but afterward, he no longer received such referrals.

Other evidence is discussed below.

## I

As indicated above, in the second, fifth, seventh and ninth counts the plaintiff alleged that each of the respective hospitals denied him due process of law, and in the third, sixth, eighth and tenth causes of action he alleged he was improperly denied privileges because in denying him privileges each of the hospitals failed to follow its own bylaws. Moreover, since all of the alleged wrongful losses or denials of access to hospital facilities were alleged as acts involved in the conspiracy charged in count one, the same issues were pertinent to the first cause of action.

In the course of ruminating upon the defendants' motions for nonsuits, which were denied, the court observed, ". . . I am inclined to the view that if it goes to the jury it is going to the jury only on the tort count, and nothing else. And whether or not there is a compliance with the by-laws or whether or not some of these other points are to be established that are

involved in the equitable side of the Court, I don't need the jury's advice and I am inclined to the view that it is not for their determination. And whether or not legal questions arise with respect to compliance with the by-laws and such things, those are questions for me to decide and not for them." Counsel for plaintiff agreed that "the questions relating to whether they have observed the by-laws . . . is a question for the Court to determine." He pointed out, however, ". . . it would be my position that once they have not carried out their own by-laws, then having reached that conclusion it seems to me that our subsequent second through nine causes of action, that damages do flow from that because of their failure to live up to the by-laws." Thereafter, after all sides had rested, and the defendants' motions for directed verdicts had been denied, attention was given to the matter of instructions. The plaintiff pointed out that the court had omitted all of the instructions submitted by the plaintiff relating to causes of action two through ten.[4] The court not only refused the instruc-

---

[4] One instruction (No. 5) read: "The court has found as a matter of law and so instructs you that the defendants FRANKLIN HOSPITAL, HANNEMANN HOSPITAL, ST. JOSEPH'S HOSPITAL and FRENCH HOSPITAL are enterprises affected with a public interest and that that public interest relates directly to the question of membership on the medical staffs of such hospitals. Accordingly, these defendants owed to plaintiff the duty and these defendants owed to the public the duty to refrain from dismissing plaintiff from their medical staffs and to refrain from refusing to renew his memberships on their respective medical staffs, except for good cause shown in a hearing at which an impartial tribunal could fairly make a decision on the merits of any such alleged cause. In law, the right to such a hearing is known as 'due process of law.' The law does not prescribe any particular form to be followed by an enterprise such as that of the defendants in affording due process of law, but it does recognize certain rudimentary elements of due process which must appear in any case else due process will be lacking. Those elements are:

"(1) The tribunal making the decision must be a fair and impartial one free from bias or prejudice and able to make a decision on the merits and evidence presented alone;

"(2) The affected party, that is the party whose rights are at stake, must be given fair notice of the charges against him and a fair opportunity to prepare his defense;

"(3) The affected party must have an opportunity to examine and refute the evidence against him and an opportunity to present evidence in his own behalf.

"In this case, you must determine whether the defendant hospitals afforded plaintiff due process of law in connection with their dismissals of him from their medical staffs or their failure to renew his respective memberships on their medical staffs. If you find from the evidence before you that the conduct of the defendants in connection with those dismissals or failures to renew memberships complied with those rudimentary elements of due process of law as I have indicated them to you, then the dismissals or failures to renew memberships did not deprive plaintiff of any legal rights by any unlawful means. However, if you find that the defendants failed to comply with all of those rudimentary elements, then their dismissals or failures to renew plaintiff's memberships in their respective medical staffs unlawfully deprived plaintiff of valuable rights without due process of law.

"In connection with this consideration, you shall consider the conduct of each of the defendant hospitals as respects plaintiff's membership on its medical staff individually."

tions offered by plaintiff, but also granted the hospital defendants' motion that the bylaws, although received in evidence, should not be submitted to the jury, and charged the jury it should not attempt to determine in any way whether or not there had been compliance with any bylaws, and that the defendants were not required to grant any hearing or give plaintiff any reason for his nonreappointment to the staff of any hospital.[5]

A second (No. 6) parroted the first part of the foregoing instruction through the exposition of the three elements and concluded, "In this case, the defendant hospitals failed to accord plaintiff due process of law."

A third (No. 13) included the following statement, "To exclude or bar a physician or surgeon otherwise qualified from access to hospitals which are of value to him in the pursuit of his calling is wrongful, tortious and injurious to the affected physician or surgeon unless there exist adequate, legally sufficient reasons for such exclusion and bar and unless, further, such exclusion and bar are accomplished in compliance with the standards of due process of law as these instructions define those standards. Such exclusion and bar are wrongful, tortious and injurious in each instance even though at the time of each occurrence the physician or surgeon has access to another hospital or hospitals."

Another proposed instruction (No. 11) read as follows: "If you find that a conspiracy existed to harm plaintiff, then you shall consider individually with respect to each of the defendants herein whether that defendant was a part of the conspiracy or whether on the other hand that defendant acted with regard to plaintiff entirely independently of the conspiracy. If you find that the defendant was a part of the conspiracy, then that defendant is liable for all of the injury done to plaintiff through the conspiracy. If that defendant did not become a participant in the conspiracy, then that defendant is responsible only for the injury done by that defendant, either personally, as in the case of individual defendants, or on its behalf, as in the case of the corporate defendants. In that connection, you will recall the instructions I have given to you about legal causation and the responsibility of any person whose conduct contributes to the infliction of an injury for the entire injury."

[5] These instruction read: "In this case the plaintiff has alleged that his failure of reappointment to the medical staffs of Franklin Hospital, St. Joseph's Hospital and Hahnemann Hospital, and his failure of appointment to the medical staff of French Hospital in the year 1962 was in violation of the rules and by-laws of the medical staffs of said hospitals and was also in violation of certain principles of law.

"You are instructed that it is the function of the Court alone to decide the issues raised by these particular allegations. Therefore the jury should not concern itself with these allegations and should not attempt to determine in any way whether or not the medical staff rules and by-laws or other rules of law were complied with by the defendant hospitals in connection with the procedures whereby the plaintiff was not reappointed to or granted staff privileges at said hospitals.

"You are instructed that the rules and by-laws of Franklin Hospital, St. Joseph's Hospital and Hahnemann Hospital did not provide for a hearing in the event that a physician was not reappointed to the medical staff in the year 1962, nor did rules and by-laws provide that a physician may be given any reason for his failure of reappointment. You are further instructed that the rules and by-laws of French Hospital did not provide for a hearing in the event that a physician as [*sic* "was"] not granted permanent staff privileges upon application in the year 1962, nor did said rules and by-laws provide that a physician be given any reason for his failure of reappointment.

"Therefore said defendants were not required to grant any hearing or give to plaintiff any reason for his non-reappointment or non-reappointment [*sic* "non-appointment"] to the staffs of these hospitals."

Immediately following the retirement of the jury plaintiff's counsel again directed the court's attention to the fact that his client was seeking damages for failure of the hospitals to grant him due process or even comply with their bylaws. The court deferred further ruling pending a verdict from the jury.

After the jury had deliberated for a portion of the morning and until 4 p.m., it returned to the court with an inquiry, "Laws of the court regarding this case, regarding hearings of hospitals." The court then reinstructed the jury as set forth in the second of defendants' instructions (see fn. 5 above).

After the jury was discharged the court's misapprehension about the demand for money damages on counts two through ten was highlighted by the following colloquy: "[Attorney for hospital defendants]: . . . our recollection is that this record will show that a judgment of nonsuit was granted in nine counts insofar as they purported to claim money damages. The Court made that ruling. The Court: Well money damages were not sought in any of the other counts as I recall it. [¶] I thought you sought equitable relief in the other counts? [Attorney for hospital defendants]: No, there was a prayer for money damages."

Plaintiff asserts prejudicial error in each of the foregoing rulings of the court. He contends generally that private nonprofit hospitals in California may not arbitrarily and discriminatorily deprive a doctor of his membership on their staffs, where the doctor has been properly admitted and continues to meet reasonable qualifications for membership required of all other doctors. More specifically he contends that such a hospital may not constitutionally deprive a doctor of hospital staff privileges without granting him minimal due process of law protection because the hospitals are vested with the public interest and are obligated to act within limitations imposed by the Constitution, and because the power to prevent a surgeon from hospital staff participation is the power to deny the doctor the right to fully practice his profession, and may not be exercised arbitrarily. He also asserts that the hospitals which denied him a reappointment erred in failing to comply with their own bylaws, and that insofar as the bylaws do not provide for an opportunity to be heard, such a right must of necessity be interpolated.

—A—

The hospital defendants rely upon the widely accepted rule that

a private hospital may exclude or fail to reappoint a physician to its medical staff so long as the action is not arbitrary or capricious.[6]

Typical of the majority view is *Van Campen* v. *Olean General Hospital* (1924) 210 App.Div. 204 [205 N.Y.S. 554] in which the appellate division reversed an injunction which had been granted by the trial court to order the reinstatement of a doctor who allegedly had been dropped from the staff by arbitrary and confiscatory action. The court found that the hospital was a private, although nonprofit, corporation and that its status was not affected by the fact that it might receive a donation from the government to enable it to carry on its work, or funds from a city or county to care for sick, disabled, indigent persons, nor by the facts that it had been granted exemption for liability to its patients and exemption from taxation. (210 App.Div. at pp. 206-207 [205 N.Y.S. at pp. 555-556]. See also *Mauer* v. *Highland Park Hospital Foundation* (1967) 90 Ill.App.2d 409, 412-415 [232 N.E.2d 776, 778-779]; *Halberstadt* v. *Kissane* (1966) 51 Misc.2d 634 at p. 637 [273 N.Y.S.2d 601, 604-605], affd. (1968) 31 App.Div. 568, 569 [294 N.Y.S.2d 841, 842]; *State* ex rel. *Sams* v. *Ohio Valley General Hospital Assn.* (1965) 149 W.Va. 229, 232-237 [140 S.E.2d 457, 460-462]; and *Khoury* v. *Community Memorial Hospital, Inc.* (1962) 203 Va. 236, 244-245 [123 S.E.2d 533, 538-539]; *Edson* v. *Griffin*

---

[6]*Moore* v. *Andalusia Hospital, Inc.* (1969) 284 Ala. 259, 262 [224 So.2d 617, 619]; *Mauer* v. *Highland Park Hospital Foundation* (1967) 90 Ill.App.2d 409, 414-415 [232 N.E.2d 776, 779]; *Halberstadt* v. *Kissane* (1966) 51 Misc.2d 634, 637-638 [273 N.Y.S.2d 601, 605], affd. (1968) 31 App.Div.2d 568, 569 [294 N.Y.S.2d 841, 842]; *Kurk* v. *Medical Society of County of Queens, Inc.* (1965) 24 App.Div.2d 897, 898 [264 N.Y.S.2d 859, 860-861], affd. (1966) 18 N.Y.2d 928, 929 [276 N.Y.S. 2d 1007, 1008, 223 N.E.2d 499, 500]; *Leider* v. *Beth Israel Hospital Assn.* (1962) 11 N.Y.2d 205, 209 [227 N.Y.S.2d 900, 901, 182 N.E.2d 393, 394]; *Van Campen* v. *Olean General Hospital* (1924) 210 App.Div. 204, 208 [205 N.Y.S. 554, 557-558], affd. (1925) 239 N.Y. 615, 616 [147 N.E. 219]; *Shulman* v. *Washington Hospital Center* (D.D.C. 1963) 222 F.Supp. 59, 63; *Foote* v. *Community Hospital of Beloit* (1965) 195 Kan. 385, 388 [405 P.2d 423, 425]; *State* ex rel. *Sams* v. *Ohio Valley General Hospital Assn.* (1965) 149 W.Va. 229, 237-239 [140 S.E.2d 457, 462-463]; *Weary* v. *Baylor University Hospital* (Tex.Civ.App. 1962) 360 S.W.2d 895, 897-898; *Khoury* v. *Community Memorial Hospital, Inc.* (1962) 203 Va. 236, 245 [123 S.E.2d 533, 539]; *Edson* v. *Griffin Hospital* (1958) 21 Conn.Supp. 55, 59-60 [144 A.2d 341, 344-345]; *Glass* v. *Doctors Hospital* (1957) 213 Md. 44, 61-62 [131 A.2d 254, 263]; *West Coast Hospital Ass'n.* v. *Hoare* (Fla. 1953) 64 So.2d 293, 299; *Monyek* v. *Parkway General Hospital, Inc.* (Fla.App. 1973) 273 So.2d 430, 431; and *Natale* v. *Sisters of Mercy* (1952) 243 Iowa 582, 594-595 [52 N.W.2d 701, 708-709]; *Group Health Cooperative* v. *King County Medical Soc.* (1952) 39 Wn.2d 586, 667 [237 P.2d 737, 780]; and see *Rao* v. *Board of County Commissioners (Pierce)* (1972) 80 Wn.2d 695, 696 [497 P.2d 591, 592] [cert. den. (1972) 409 U.S. 1017 (34 L.Ed.2d 309, 93 S.Ct. 436)] [recognizing trend toward court review]; and *Rao* v. *Auburn General Hospital* (1973) 10 Wn.App. 361, 365-368 [517 P.2d 240, 243-244]. See also cases collected Annotation, Exclusion of or Discrimination Against Physician or Surgeon by Hospital (1971) 37 A.L.R.3d 645, section 2, pages 649-651 and section 3a, pages 659-661.

*Hospital* (1958) 21 Conn.Supp. 55, 57-58 [144 A.2d 341, 343-344]; and *West Coast Hospital Ass'n.* v. *Hoare* (Fla. 1953) 64 So.2d 293, 296.)

Having so concluded the court in *Van Campen* upheld a bylaw which provided "if the board of directors shall determine that the character, conduct, or acts of any member of the medical staff are such as to interfere with the orderly conduct of the hospital, the board may by resolution remove or suspend him." (210 App.Div. at p. 208 [205 N.Y.S. at p. 557].) It ruled, "There is no provision in the by-laws for a hearing prior to removal or suspension. We think none is required. The selection and retention of physicians to treat patients admitted to the hospital are matters of judgment and discipline. The power to appoint usually implies the authority to remove. [Citations.] In common experience instances are not unusual where some physician disagrees with hospital management. When such disagreement becomes so pronounced as to interfere with orderly management and discipline, and when there is persistent violation and disobedience of necessary rules and regulations, we think the directors may bring the inharmonious conditions to an end by summary action. They are not required, in our judgment, to give notice and conduct a trial in every such case." (*Id.* See also *Moore* v. *Andalusia Hospital, Inc.* (1969) 284 Ala. 259, 262 [24 So.2d 617, 619]; *Leider* v. *Beth Israel Hospital Assn.* (1962) 11 N.Y.2d 205, 208 [227 N.Y.S.2d 900, 901, 182 N.E.2d 393]; *State* ex rel. *Sams* v. *Ohio Valley General Hospital Assn., supra,* 149 W. Va. at pp. 237-239 [140 S.E.2d at pp. 462-463]; *Khoury* v. *Community Memorial Hospital, Inc., supra,* 203 Va. at p. 245 [123 S.E.2d at p. 539]; and *Glass* v. *Doctors Hospital* (1957) 213 Md. 44, 61-62 [131 A.2d 254, 263].)

The court further noted, "The law does not require a corporation like defendant to furnish its services and accommodations to everyone who applies, whether patient or physician. There can be no absolute right in individuals to claim the benefit of its privileges. Such a thing would be impossible. There must be discretion vested in the management to make selection from applicants with regard to accommodations available. It may reject one who has some trivial ailment, and accept another whose needs are greater. This is not illegal discrimination, depriving a person of his rights; nor do we deem it such discrimination, if from a large number of physicians it selects members of its visiting staff with regard, not only to their medical skill, but to their adaptability to the rules and discipline of the institution. [Citation.]" (*Id.* p. 209 [205 N.Y.S. at p. 558]. See also *Mauer* v. *Highland Park Hospital Foundation, supra,* 90 Ill.App.2d at pp. 415-416 [232 N.E.2d at pp. 779-780]; *Halberstadt* v. *Kissane, supra,* 51 Misc.2d at p. 639 [273 N.Y.S.2d 601, 606]; and *Weary* v. *Baylor University Hospital* (Tex.Civ.App. 1962) 360 S.W.2d 895, 897.)

Two other factors were noted in *Mauer* v. *Highland Park Hospital Foundation, supra.* There the court pointed out that it should not substitute its judgment for that of those charged with the government of the hospital because, among other reasons, there was a potential liability in the hospital for malpractice if it permitted those to practice in the hospital who were not qualified to do so, and because, in the absence of a show of monopoly, there was no need to require the admission of any particular doctor to any particular hospital if other hospitals were available for his patients and practice. (90 Ill.App.2d at pp. 415-416 [232 N.E.2d 776, 779].)

The hospital defendants claim that the foregoing cases demonstrate that the plaintiff had no rights which were violated, and that they also support the rulings and instructions of the trial court.

On the other hand there are numerous precedents recognizing that even a private hospital may not always arbitrarily exclude a qualified physician from the use of its facilities. In *Greisman* v. *Newcomb Hospital* (1963) 40 N.J. 389 [192 A.2d 817] the court approved a lower court judgment which directed a private hospital to consider a licensed osteopath-physician's application for membership on the courtesy staff of a private hospital without reference to requirements in the bylaws which excluded him because he was not a member of the county medical society and had not graduated from a medical school approved by the American Medical Association, which provisions were held invalid because they did not relate to individual merit and were not in furtherance of the common good. The court noted the general rule which has been reviewed above and noted, "[Such hospitals] are private in the sense that they are nongovernmental but they are hardly private in other senses. Newcomb is a nonprofit organization dedicated by its certificate of incorporation to the vital public use of serving the sick and injured, its funds are in good measure received from public sources and through public solicitation, and its tax benefits are received because of its nonprofit and nonprivate aspects. [Citation.] It constitutes a virtual monopoly in the area in which it functions and it is in no position to claim immunity from public supervision and control because of its allegedly private nature. Indeed, in the development of the law, activities much less public than the hospital activities of Newcomb, have commonly been subjected to judicial (as well as legislative) supervision and control to the extent necessary to satisfy the felt needs of the times." (40 N.J. at p. 396 [192 A.2d at p. 821].) The court concluded that under the circumstances "the hospital's power to pass on staff membership application is a fiduciary power, and [the applicant] is entitled to have his application evaluated on its own individual merits without

regard to the bylaw requirement rejected by the [trial court] . . . while the managing officials may have discretionary powers in the selection of the medical staff, those powers are deeply imbedded in public aspects, and are rightly viewed, for policy reasons . . . as fiduciary powers to be exercised reasonably and for the public good." (*Id.* at pp. 401-402 [*id.*, at p. 824]. See also *Sussman* v. *Overlook Hospital Assn.* (1967) 95 N.J.Super. 418, 422 [231 A.2d 389, 391].)

This decision flowed from an earlier decision which had reversed a lower court dismissal of an action for injunctive relief to require a hearing before dismissal from the staff of a private hospital as provided in its by-laws (*Joseph* v. *Passaic Hospital Association* (1958) 26 N.J. 557, 562-570 [141 A.2d 21-25]; see also part I-B, *infra*), and a second holding that had applied principles enunciated in *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], to require a county medical society to admit a licensed osteopathic physician despite an unwritten requirement, held "arbitrary, unreasonable and beyond the pale of the law," that a member must have had four years attendance at an A.M.A. approved medical college. (*Falcone* v. *Middlesex County Medical Soc.* (1961) 34 N.J. 582, 598 [170 A.2d 791, 800, 89 A.L.R.2d 952]. Cf. *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 22-24 [112 Cal.Rptr. 786, 520 P.2d 10].) Finally, it should be noted that the court in *Greisman* adverted to *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806 [26 Cal.Rptr. 640, 376 P.2d 568], which with other California cases is reviewed below. The quasi-public nature of hospitals organized and operated by private nonprofit corporations has been elsewhere recognized under varying circumstances.[7]

The federal courts have ruled that when a private hospital accepts federal funds for construction or operation discrimination against physicians may constitute a violation of the Fourteenth Amendment. (See *Sams* v.

---

[7]See *Adler* v. *Montefiore Hospital Assn. of W. Pa.* (1973) 453 Pa. 60, 68-72 [311 A.2d 634, 639-640]; *Berberian* v. *Lancaster Osteopathic Hosp. Assn., Inc.* (1959) 395 Pa. 257, 261-262 [149 A.2d 456, 458]; *Bricker* v. *Sceva Speare Memorial Hospital* (1971) 111 N.H. 276, 279 [281 A.2d 589, 592, cert. den. (1971) 404 U.S. 995 (30 L.Ed.2d 547, 92 S.Ct. 535)]; *Hagan* v. *Osteopathic General Hospital of R. I.* (1967) 102 R.I. 717, 722 [232 A.2d 596, 599-600]; *Woodard* v. *Porter Hospital, Inc.* (1966) 125 Vt. 419, 422 [217 A.2d 37, 39]; *Davidson* v. *Youngstown Hospital Association* (1969) 19 Ohio App.2d 246, 249-251 [48 Ohio Ops.2d 371, 250 N.E.2d 892, 895-896]; *McCray Memorial Hospital* v. *Hall* (1967) 141 Ind.App. 203, 210-212 [226 N.E.2d 915, 919-920]; *Virgin* v. *American College of Surgeons* (1963) 42 Ill. App.2d 352, 368-371 [192 N.E.2d 414, 422-424]; *State* v. *City of Parkersburg* (1964) 148 W.Va. 568, 572-573 [136 S.E.2d 783, 786]; *Giles* v. *Breaux* (La.App. 1964) 160 So.2d 608, 618; and Annotation, *supra*, 37 A.L.R.3d 645, section 3b, pages 661-663.

*Ohio Valley General Hospital Association* (4th Cir. 1969) 413 F.2d 826, 828-830; and *Citta* v. *Delaware Valley Hospital* (E.D.Pa. 1970) 313 F. Supp. 301, 306-310; and note, *Eaton* v. *Grubbs* (4th Cir. 1964) 329 F.2d 710, 713-715; and *Simkins* v. *Moses H. Cone Memorial Hospital* (4th Cir. 1963) 323 F.2d 959, 965-969 [cert. den. (1964) 376 U.S. 938 (11 L.Ed.2d 659, 84 S.Ct. 793)].)

The conflicting doctrines were reviewed by the Supreme Court of Hawaii in *Silver* v. *Castle Memorial Hospital* (1972) 53 Hawaii 475 [497 P.2d 564] [cert. den. (1972) 409 U.S. 1048 (34 L.Ed.2d 500, 93 S.Ct. 517), and rehg. den. (1973) 409 U.S. 1131 (35 L.Ed.2d 264, 93 S.Ct. 936)]. There the court, although acknowledging that the hospital involved had more than a nominal governmental involvement in the form of funding, noted: ". . . if the proposition that any hospital occupies a fiduciary trust relationship between itself, its staff and the public it seeks to serve is accepted, then the rationale for any distinction between public, 'quasi public' and truly private breaks down and becomes meaningless, especially if the hospital's patients are considered to be of primary concern." (53 Hawaii at p. 482 [497 P.2d at p. 570].)

In this state the following rules have been established with respect to publicly owned and maintained hospitals: ". . . a licensed physician and surgeon does not have the right *per se* to practice in a public hospital, but that right is subject to reasonable rules and regulations. (*Hayman* v. *Galveston,* 273 U.S. 414 . . .) However, we do not believe that a licensed physician or surgeon whose license to practice is unrevoked and who is in good standing can be denied the right to practice in a public hospital merely because of past conduct which made him subject to disciplinary action by the Board of Medical Examiners. If he is to be excluded it must be for existing cause. '[T]he nature of a public hospital imposes an actual, although implied, limitation upon the authority of respondent to restrict arbitrarily the use of the hospital by the public, whether physician or patient.' (*Alpert* v. *Board of Governors,* 286 App.Div. 542 . . .)" (*Wyatt* v. *Tahoe Forest Hospital Dist.* (1959) 174 Cal.App.2d 709, 714 [345 P.2d 93]. See also *Martino* v. *Concord Community Hosp. Dist.* (1965) 233 Cal.App.2d 51, 58 [43 Cal.Rptr. 255].) "A hospital district in the exercise of its duty to prescribe reasonable rules and regulations must set up standards [of] qualifications for those who wish to serve in the hospital which are general but not arbitrary or discriminatory. These should be clear, not vague, ambiguous or uncertain. [Citation.]" (*Id.,* p. 715. See also *Rosner* v. *Eden Township Hospital Dist.* (1962) 58 Cal.2d 592, 598 [25 Cal.Rptr. 551, 375 P.2d 431]; and *Martino* v. *Concord*

*Community Hosp. Dist., supra,* 233 Cal.App.2d at pp. 58-60.) The court further held, "The applicant has the right to a hearing to determine whether or not his qualifications meet the requirements established by law." (*Id.,* p. 716. See also *Martino* v. *Concord Community Hosp. Dist., supra,* 233 Cal.App.2d 51, 56-57.)

The New Jersey decision in *Greisman* v. *Newcomb Hospital supra,* has been recognized as standing for the proposition that even a private hospital may not arbitrarily or unreasonably exclude a qualified physician. (See *Blank* v. *Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377, 383, fn. 2 [44 Cal.Rptr. 572]; and *Rosner* v. *Peninsula Hospital Dist.* (1964) 224 Cal.App.2d 115, 119, fn. 2 [36 Cal.Rptr. 332].) In *Willis* v. *Santa Ana etc. Hospital Assn., supra,* 58 Cal.2d 806, an osteopathic physician's staff privileges had been terminated without hearing or assigned reason as a result of what, he alleged, was a conspiracy to eliminate competition. In overruling a judgment of dismissal entered after general demurrers had been sustained, the court observed: "We reject the suggestion that, in order to maintain professional standards and medical care of high quality, private hospitals and their staffs must have absolute discretion to exclude doctors from membership, without possibility of a suit for damages resulting from the exclusion. The burden of defending suits cannot warrant denial of relief to one injured by wholly unjustifiable conduct such as is alleged in the present case." (58 Cal.2d at pp. 810-811.)

The public hospital cases look to the Local Hospital District Law (Health & Saf. Code, div. 23, § 32000 et seq.) for guidance in determining what regulations a public hospital established in such a district may prescribe. (See *Rosner* v. *Eden Township Hospital Dist., supra,* 58 Cal. 2d at p. 596; *Martino* v. *Concord Community Hosp. Dist., supra,* 233 Cal.App.2d at p. 58; *Rosner* v. *Peninsula Hospital Dist., supra,* 224 Cal. App.2d 115, 118-121; and *Wyatt* v. *Tahoe Forest Hospital Dist., supra,* 174 Cal.App.2d at p. 712.) Health and Safety Code section 32128, as originally added in 1949 (Stats. 1949, ch. 919, § 3, p. 1683) and until its amendment in 1970 (Stats. 1970, ch. 623, § 12, p. 1237)[8] provided in pertinent part, "The rules of the hospital, established by the board of directors pursuant to this article, shall include: 1. Provision for the organization of physicians and surgeons . . . who are permitted to practice in the hospital into a formal medical staff, with appropriate officers and by-laws and with staff appointments on an annual basis; 2. Provision

---

[8]In 1970 subdivision 2 was amended to read: "2. Provision for procedure for appointment and reappointment of medical staff as provided by the standards of the *Joint Committee on Accreditation of Hospitals;* . . ."

that membership on the medical staff shall be restricted to physicians and surgeons competent in their respective fields, worthy in character and in professional ethics, . . . [¶] Said rules of the hospital shall, insofar as consistent herewith, be in accord with and contain, minimum standards not less than the rules and standards of private or voluntary hospitals operating within the district." In 1965 section 2392.5 (Stats. 1965, ch. 1460, § 2, p. 3419, amended to provide for biennial appointments, Stats. 1973, ch. 58, § 1, p. 101) was added to the Business and Professions Code to provide in part as follows: "The regular treatment of or prescribing for patients in a licensed general or specialized hospital having five or more physicians and surgeons on the medical staff which does not have rules established by the board of directors thereof to govern the operation of the hospital, which rules include, among other provisions, all the following, constitutes unprofessional conduct within the meaning of this chapter: [¶] (a) Provision for the organization of physicians and surgeons licensed to practice in this state who are permitted to practice in the hospital into a formal medical staff with appropriate officers and bylaws and with staff appointments on an annual or biennial basis. [¶] (b) Provision that membership on the medical staff be restricted to physicians and surgeons and other licensed practitioners competent in their respective fields, worthy in character and in professional ethics, . . ." It appears that the Legislature intended private hospitals to be governed by the same criteria as public hospitals. (See *Goodley* v. *Sullivant* (1973) 32 Cal.App.3d 619, 625 [108 Cal.Rptr. 451].)

Finally it should be noted that a unanimous state Supreme Court has stated that a private entity does not have absolute discretion to deprive a person of a substantial right. In *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13] [cert. den. (1972) 407 U.S. 924 (32 L.Ed.2d 811, 92 S.Ct. 2452)], the court noted: ". . . California courts have long preserved the individual's right to notice and a meaningful hearing in instances in which a significant deprivation is threatened by a *private* entity, as well as by a governmental body. (See *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 165-166 . . . (exclusion from professional association); *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143 . . . (expulsion from union); *Taboada* v. *Sociedad Espanola etc. Mutua* (1923) 191 Cal. 187, 191-192 . . . (removal from fraternal society); *Otto* v. *Tailors' P. & B. Union* (1888) 75 Cal. 308, 314-315 . . . (expulsion from union); *Curl* v. *Pacific Home* (1952) 108 Cal.App.2d 655, 659-660 . . . (expulsion from old-age home).)" (5 Cal.3d at pp. 550-551, fn. 11. See also *Greenberg* v. *Hollywood Turf Club* (1970) 7 Cal.App.3d 968, 976 [86 Cal.Rptr. 885]; and

cf. *Cal-Medicon* v. *Los Angeles County Medical Assn.* (1971) 20 Cal. App.3d 148, 152-153 [97 Cal.Rptr. 530]; and *Blatt* v. *University of So. California* (1970) 5 Cal.App.3d 935, 939-942 [85 Cal.Rptr. 601].)

The unmistakable trend of the judicial decisions and legislative enactments in this state supports the principle that a private hospital may not deprive a physician of staff privileges without granting him minimal due process of law protection. This protection should be that recognized in *Silver* v. *Castle Memorial Hospital, supra.* There the court, after noting the respective interests of the doctor, the hospital, and the public, concluded: ". . . due process, in this context, requires that a fair and thorough consideration be made of a doctor's application for initial appointment or reappointment to the staff. Therefore, a hearing before the deciding board must be provided. It is not possible that such a hearing require all the aspects of a formal judicial or quasi judicial hearing. . . . The doctor should be on notice that a hearing is available to him. He should be given timely notification sufficiently prior to the hearing for him to adequately prepare a defense. In conjunction with such notice, a doctor whose privileges are being revoked or who is being denied reappointment should be provided a written statement of the charges against him. Such statement should be sufficiently adequate to apprise him of the specific charges against him. A doctor who is being denied initial appointment to a hospital staff should be provided a written statement specifying the reasons his application is being denied.

"Because a hospital board has no subpoena power, there can be no right to confront and cross-examine persons who have made adverse statements of a doctor unless such persons testify at the hearing. However, a doctor should have the right to call his own witnesses.

"It should be within the discretion of the hospital board as to whether counsel may attend the hearing and participate in the proceedings. Participation of counsel would problably not be necessary unless the hospital's attorney is used in the proceedings or the extreme nature of the charges involved indicated that representation by an attorney would be advantageous. Such a limitation would not preclude a doctor from consulting an attorney prior to the hearing even though the attorney was not allowed to participate in the hearing itself.

"The basis for the decision of the board must come from substantial evidence which was produced at the hearing. As such the board cannot rely on *ex parte* communications that were not made known to the doctor in question. The utilization of such material would render ineffective the

doctor's right to answer the charges upon which the denial of his staff privileges are based.

"The decision of the board should be written, including the basis for the decision, thus providing a record for judicial review." (53 Hawaii at pp. 484-485 [497 P.2d at pp. 571-572].)

It is clear that the court erred in instructing the jury that it should not concern itself with whether or not the hospitals in failing to reappoint or appoint the plaintiff had violated certain principles of law, and that the hospitals were not required to give him a hearing or give him any reason for their action. Before examining the effect of this error in the light of the record in the case, attention should be directed to a second alleged error in law.

—B—

■ Plaintiff draws from the law of fraternal societies, labor unions, mutual benefit societies and unincorporated professional, trade or business associations for the propostion that he was entitled to at least minimum due process protections against arbitrary action by any of the hospitals. In *Taboada* v. *Sociedad Espanola etc.* (1923) 191 Cal. 187 [215 P. 673, 27 A.L.R. 1508], the court laid down the following principles: "It is a fundamental principle of justice that no man may be condemned or prejudiced in his rights without an opportunity to make his defense. This rule is not confined alone to courts of justice and strictly legal tribunals, but is applicable to every tribunal which has the power and authority to adjudicate questions involving legal consequences. And a society acting upon the expulsion of a member is a *quasi*-judicial body and its hearing is a *quasi*-judicial hearing. [Citation.] The proceedings of the society, in order to be regular and legal, in effect, must, therefore, provide for notice to the accused and afford him an opportunity to be heard. [Citation.] [¶] Indeed, it has been held that even though the by-laws expressly provide for the expulsion of a member without a trial such a provision is void and an expulsion in pursuance of such a by-law is not binding. [Citations.]" (191 Cal. at p. 191. See also *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143-144 [231 P.2d 6, 21 A.L.R.2d 1387]; *Tatkin* v. *Superior Court* (1958) 160 Cal.App.2d 745, 754-757 [326 P.2d 201]; *Bernstein* v. *Alameda etc. Med. Assn.* (1956) 139 Cal.App.2d 241, 253-254 [293 P.2d 862]; *Swital* v. *Real Estate Commissioner* (1953) 116 Cal.App.2d 677, 679-680 [254 P.2d 587]; *Curl* v. *Pacific Home* (1952) 108 Cal.App.2d 655, 659-660 [239 P.2d 481]; *Ellis* v. *American Federation of Labor* (1941) 48 Cal.App.2d 440, 443-444 [120 P.2d 79]; *Falcone* v. *Middlesex County*

*Medical Soc., supra,* 34 N.J. 582, 596-597 [170 A.2d 791, 799]; *Berberian* v. *Lancaster Osteopathic Hosp. Assn., Inc., supra,* 395 Pa. 257, 262-265 [149 A.2d 456, 458-460]; *Bricker* v. *Sceva Speare Memorial Hospital, supra,* 111 N.H. 276, 279-280 [281 A.2d 589, 592]; *Virgin* v. *American College of Surgeons, supra,* 42 Ill.App.2d 352, 368-371 [192 N.E.2d 414, 422-424]; *State* v. *City of Parkersburg, supra,* 148 W.Va. 568, 572-573 [136 S.E.2d 783, 786]; *Giles* v. *Breaux, supra* (La.App.) 160 So.2d 608, 615. Cf. *Erickson* v. *Gospel Foundation of Calif.* (1954) 43 Cal.2d 581, 585-588 [275 P.2d 474]; and *Blatt* v. *University of So. California, supra,* 5 Cal.App.3d 935, 939-942.)

The hospital defendants apparently concede that compliance with the bylaws of a hospital is required, but they assert that there is no requirement that the bylaws must provide a right to a hearing before a licensed physician may be deprived of or denied staff privileges. They contend that the cases dealing with membership in professional societies where relief was granted involve a showing of monopoly which is not present in this case because the four hospitals involved are only a small fraction of the many hospitals in the San Francisco Bay Area, and that they do not have monopolistic control over the plaintiff's right to practice his profession.[9] This is too narrow an interpretation of the economic disadvantage in question. The plaintiff alleged, and there was evidence to support the allegation, that he suffered economic loss by reason of his exclusion from the staff of three hospitals which had extended him staff privileges. Even if an applicant is not entitled to procedures provided by the bylaws before his application is rejected, the existing staff member, under the authorities referred to above, is entitled to have his dismissal considered as required by the bylaws, and to a hearing even though the bylaws do not so provide.

The trial court also erred in failing to advise the jury of the foregoing principles.

## II

In their brief the hospital defendants assert that if the plaintiff were entitled to a hearing the court's ruling and judgment left him with the right to apply for equitable relief because the judgment merely provided that he was not entitled to monetary damages under the second through tenth causes of action. At oral argument it was suggested that the

---

[9]The mere existence of other hospitals may not be a sufficient safety valve to prevent deprivation of substantial economic advantages. The advent of comprehensive health planning (Pub. L. No. 89-749, 42 U.S.C.A. § 246; and Health & Saf. Code, §§ 1250-1318) make it apparent that not every hospital may be able to render special services or even all of the basic services to patients with specialized needs.

case be remanded and the judgment be modified to require the hospitals to give the plaintiff a hearing with respect to his right to staff privileges, but that no monetary damages be permitted because the plaintiff had failed to show a conspiracy. The intertwined issues may not so simply be unraveled. The fact, if it be such, that a hospital defendant failed to accord the plaintiff the procedures to which he was entitled under its bylaws, not to mention any hearing at all, would be relevant with respect to the motive for his exclusion, and so, in turn, on the issue of conspiracy. (See *Tatkin* v. *Superior Court, supra,* 160 Cal.App.2d 745, 765.) It is, therefore, necessary to examine the record to determine whether there was evidence to sustain the assertion that plaintiff was deprived of the rights reviewed above, and if so whether the failure to permit the jury to consider the effect of that evidence was prejudicial.

The evidence is clear that in no instance was the plaintiff advised of the reason for his nonreappointment or nonappointment, as the case might be. Nor was he granted a hearing by any hospital. There was evidence to show that at Franklin Hospital there were no complaints before either a duly constituted tissue committee or a credential committee, and that the executive committee's recommendation of nonappointment to the governing committee was predicated solely on hearsay information furnished by the defendant Butler without any check of hospital records. At St. Joseph's Hospital the plaintiff received conflicting information concerning the reasons for his dismissal, and the witnesses for the hospital indicated that the last formal action, other than to refuse admittance to plaintiff's patients, was to defer action to secure a legal opinion. The evidence concerning the procedure followed at Hahnemann Hospital is of similar nature. The refusal to appoint at French Hospital appeared to follow procedures outlined by the bylaws. In each case there was evidence which would support a finding that the hospital had acted in an arbitrary and discriminatory manner without adequate investigation of the charges reported. It is concluded that the failure of the court to instruct on the plaintiff's right to hearing, and the duty of the hospitals to follow their duly instituted procedures was prejudicial.

### III

The foregoing conclusions do not necessarily dispose of the case. The other defendants claim that the evidence is insufficient to sustain a factual finding that they were engaged in conspiracy to injure the plaintiff in his professional reputation and in his profession of physician and surgeon. The hospital defendants join in that claim, and in addition they assert that

the evidence reflects that there were adequate factual grounds to deny the plaintiff staff privileges. Their claims may be separately reviewed.

 "It is long established that in ruling on a motion under Code of Civil Procedure section 630 the trial court is governed by the same rules which circumscribe its power to grant a motion for a nonsuit. [Citations.]" (*Estate of Fossa* (1962) 210 Cal.App.2d 464, 466 [26 Cal.Rptr. 687].) If there was substantial evidence tending to prove in favor of the plaintiff all the facts necessary to make out his case, he was entitled to have had the case go to the jury for a verdict on the merits. In considering the appeal all evidence tending to prove the plaintiff's case, together with all reasonable inferences to be drawn from such evidence must be taken as true, and evidence which does no more than raise a conflict with that of plaintiff must be disregarded. The directed verdict can be sustained only if it can be determined that on no legal theory has the plaintiff made out a prima facie showing of a right to recover. (*Id.* And see *Estate of Lances* (1932) 216 Cal. 397, 400-401 [14 P.2d 768].)

—A—

 The evidence relating to the medical society defendants reflects that the Press Club incident involving plaintiff, deceased defendant Bates, and the defendant Whitehall was reported to defendant Dr. Watts, and that all three were disturbed by plaintiff's derogatory remarks concerning the American Society of Internal Medicine. Dr. Watts wrote the plaintiff suggesting he owed an apology to Whitehall and Bates, and sent a copy to the office of the former society and as well to the San Francisco Medical Society. Dr. Watts testified he sent the latter copy because he felt there was "a possibility of somewhat unprofessional conduct here and that perhaps the Medical Society should be aware of it."

Plaintiff, on receipt of the letter, discussed the matter with Dr. Watts. On receiving plaintiff's assurances that he would see Whitehall and write the Press Club, the matter was closed as far as Dr. Watts was concerned.

Meanwhile, however, Dr. Webb, as president of the San Francisco Medical Society, on receipt of Dr. Watts' letter, wrote the latter recommending that the matter be brought before the Professional Relations Committee of the local society. Some weeks later a phone call was made to Dr. Watts from the local society asking him if he wished to prefer charges against plaintiff, and he replied he did not.

The foregoing falls far short of establishing directly or by inference that either Whitehall, Bates, Dr. Watts, or the national society with which they

were affiliated launched a conspiracy to injure the plaintiff in his profession. Any inference to be drawn from the facts that Dr. Watts sent Dr. Webb a copy of his letter and may have discussed the Press Club incident on the phone, or from the fact that Whitehall was interested in the matter until he was ultimately admitted to membership in the Press Club, is colorless in the light of the fact that neither Dr. Watts nor his subordinates saw fit to prefer any charges against plaintiff with the local society. If the plaintiff's views on medicare and the Press Club incident were a catalyst which triggered the subsequent actions of the hospital defendants there is a lacuna of proof to show that such a result was designed by defendants Watts and Whitehall or former defendant Bates, and the society they represented. The motion was properly granted as to those defendants.

Similarly, although the action taken was prejudicial to plaintiff, there is no evidence to show that the defendants Direct Wire Telephone Service Co. and Novitsky were implicated other than as employees or contractors with the local medical society. The record shows that in June 1962, the plaintiffs' referral card was placed in the back of the file and marked "Hold, further notice" on instructions from the executive secretary of the local medical society, the former defendant Neick; that the information passed out by the answering service was dictated by instructions from the same source; and that plaintiff's card was destroyed pursuant to instructions from the secretary. The fact that defendant Novitsky became irritated with plaintiff because he telephoned her when she was ill does not establish either that she had authority to put his card in the active file, contrary to her instructions from the society, or that she was part of, as distinguished from an instrumentality used by, the alleged conspiracy. The motion was properly granted as to those two defendants.

The San Francisco Medical Society is charged with the acts and omissions of its president Dr. Webb, and its executive secretary the former defendant Neick. Webb took the initiative in suggesting that Dr. Watts prefer charges against the plaintiff through the society, but no such action resulted. Dr. Webb also acknowledged that other complaints about, and requests for action against plaintiff, had been received by the society. He also revealed that he discussed the propriety of such action with a former president of the society and abided by the latter's advice that the plaintiff was having enough trouble with the hospitals, and nothing would be served by a prolonged hearing before the Professional Relations Committee. Mrs. Neick, however, was not so passive. Her testimony was equivocal concerning her knowledge about the Press Club incident, and about the plaintiff's relations with the hospital defendants. When plaintiff requested a hearing before the Professional Relations Committee, she countered by

instructing defendant Novitsky to remove his card from the referral list. She equivocated about her reasons for that act. She later ordered the destruction of the card. There is nothing to indicate that Dr. Webb was party to the actions of Mrs. Neick. The only evidence on the subject indicates that he told her it was wrong to delete the plaintiff's name, and that she should return it. There is also an indication that Mrs. Neick participated unwarrantedly in acts relating to the plaintiff's unsuccessful attempt to secure malpractice insurance through the carrier sponsored by the local medical society. The complicity of Dr. Webb in any plot must rest on conjecture. It does appear, however, that there is sufficient evidence to show that Mrs. Neick, as an official of the local medical society, either through excessive zeal, or pique, committed acts which tended to deprive the plaintiff of privileges which he was entitled to as a member of the society, and there is some indication that in so doing she was acting in concert with those who were responsible for his alleged wrongful deprivation of staff privileges. Although she has been discharged as a defendant, the local society may be held for her acts and omissions.

—B—

██ In May, plaintiff, whose malpractice insurance with Lloyds expired June 1, 1962, applied through the local medical society for insurance with defendant American Mutual Liability Insurance Company. The company has a master contract with the society under which it agreed to issue insurance to such members of the society as were acceptable to it. It. had insured about 70 percent of the members of the society and rejected only about 1 percent of those who had applied through the society. Plaintiff's application was once returned for completion and ultimately rejected May 28, 1962. Defendant Hadfield, the general manager of the malpractice division at the insurer's San Francisco office, testified prior to his death, and gave varying reasons for the rejection. As noted above, former defendant Neick interjected herself in the transaction, although the applications were usually handled by subordinates. Whatever inferences may run against dismissed defendant Neick, and deceased and dismissed defendant Hadfield, do not necessarily run against the defendant insurance company. "An insurance company is not bound to accept an application or proposal for insurance but may reject it for any reason or arbitrarily. [Citations.]" (*K. C. Working C. Co.* v. *Eureka-Sec. Ins. Co.* (1947) 82 Cal.App.2d 120, 131 [185 P.2d 832].) If there is no duty to furnish the insurance, the fact, if it be such, that Mrs. Neick and Hadfield conspired to prevent plaintiff from securing insurance with the defendant insurer did not render it liable. ██ "Where a complaint charges a conspiracy and the com-

mission of a wrongful act, the only significance of the conspiracy charge is that each member may be held responsible as a joint tortfeasor, regardless of whether or not he directly participated in the act. [Citations.] A conspiracy, in and of itself, however atrocious, does not give rise to a cause of action unless a civil wrong has been committed resulting in damage. It requires a determination of whether the pleaded facts show something was done which, without the conspiracy, would give rise to a right of action. [Citations.]" (*Widdows* v. *Koch* (1968) 263 Cal.App.2d 228, 234 [69 Cal.Rptr. 464]. See also *Agnew* v. *Parks* (1959) 172 Cal.App.2d 756, 762 and 763-764 [343 P.2d 118].) ▆▆ There is no evidence to show that the insurer or its agent conspired to commit the alleged wrongful denial of staff privileges which had occurred long before the application was made for the insurance. Even if Hadfield conspired with Neick to deprive plaintiff of benefits he was entitled to as a member of the local medical society the insurer's failure to accept the application gave rise to no right of action against it.

—C—

▆▆ Plaintiff had been a member of the staff of Franklin Hospital since 1959. According to plaintiff, he had performed about 250 surgeries a year at that hospital from the time of his appointment until he was advised of his ouster January 19, 1962. No charges were ever presented against him, no hearing was ever held, he was not advised of the grounds for his non-appointment, and was denied any appeal. At the trial the hospital offered evidence that reappointment was denied by the governing body, on the recommendation of the executive committee of the staff of which the defendants Monardo, the administrator, Dr. Jones, then chief of staff, and Dr. Butler, then chairman of the department of surgery, were all members. The basis of the committee's action was the alleged mismanagement of two surgical cases in November 1961. There had been no discussion or formal investigation of these cases by any of the constituted staff committees. Dr. Butler merely presented information on January 13, 1962 which had come to his attention, and which he testified he had first mentioned to the executive committee on December 1, 1961, although there was no record of such discussion. Meanwhile the credentials committee had passed plaintiff's name for reappointment on December 12, 1961. Nevertheless defendant Dr. Howard, the chairman of the credentials committee wrote members of the executive committee that he understood they would review plaintiff's reappointment at their January meeting. There was some equivocation in the testimony of Dr. Jones as to whether there was then presented sufficient detailed information concerning the cases in question. From the summary

treatment an inference is permissible that Butler, Jones, Monardo and Howard and the hospital they served were acting arbitrarily and precipitately to oust the plaintiff without dispassionate and thorough investigation of the charges.

 Plaintiff received privileges as a courtesy member of the staff of St. Joseph's Hospital in 1959 and was granted membership on the associate staff in 1961. Although there is a discrepancy in the testimony concerning the number, it is clear that plaintiff had over 100 cases in the hospital in 1960 and 1961. The bylaws of this hospital provided that reappointments should be recommended by a credentials committee and be made by a governing board. There were also provisions for termination of appointments for cause, and a specific provision reading "In any instance where a request for advancement has not been granted or a reduction in category has been made, the physician concerned shall be given an opportunity of appearing before the credentials committee for a hearing. . . . A final recommendation shall then be made by the Credentials Committee, passed on by the Executive Committee, and forwarded to the Governing Board." The bylaws also refer to a medical audit committee, a medical records and review committee, a committee on tissues and autopsies, and expressly require any member of the staff to appear at a meeting when one of his cases is to be discussed. No record was produced of any action taken by any of the above committees except as follows: the tissue and autopsy committee referred charts of two of plaintiff's patients to a surgical committee established by the chief of the surgery staff in June 1961, and another one in July 1961. The minutes of a meeting of this committee held September 6, 1961, to review two cases with plaintiff, were forwarded to the executive committee of the staff and were reviewed by it on September 25, 1961. At a November meeting a subcommittee of the executive committee was designated to make recommendations regarding the staff standings. On January 15, 1962, the executive committee deferred action on plaintiff's reappointment until a legal opinion could be obtained from an outside attorney, who at the time represented the county medical society.

Plaintiff was never formally informed that his reappointment had been deferred or denied, and first became aware of his change of status late in January when a patient he sent to the hospital was refused admission and was told that plaintiff was no longer on the staff. In response to inquiries, plaintiff was advised that he was dropped because the hospital was seeking to avoid overcrowding and to protect its older doctors by reducing the number of staff doctors in relation to the available beds. Subsequently he was told that there had been questions about the quality of his work and his general attitude and treatment of patients. The specific incidents which

arose earlier in 1961 were not mentioned, but reference was made to an alleged disturbance which was said to have occurred early in January when the plaintiff because of lack of space had to take a circumcision case from St. Joseph's to Franklin Hospital, and another incident in which a dispute arose as to whether plaintiff could secure a private room for a patient. When the plaintiff requested a hearing he was advised that the bylaw quoted above only applied to a dismissal or demotion and not to the mere election of the hospital not to reappoint. Overcrowding was again advanced as the reason for nonreappointment.

The defendant Dr. Lindner was formerly associate chief of surgery at Mount Zion Hospital. In December 1959, when he took over as chief of surgery at St. Joseph's he advised the surgical committee of plaintiff's ouster from the staff of Mount Zion, and suggested that he be watched and reported the first time he had a misstep. In March 1960, plaintiff was granted permission to conduct unlimited surgery, subject to checking with Lindner before it was done. Lindner testified that in 1961 he thought plaintiff had an awful lot of cases for a young man so shortly out of medical school, and that he received reports that plaintiff was not gentlemanly but gruff and brusque with the Sister in charge of surgery and the nurses. In June, the surgical committee concluded, with respect to the cases referred to it, that as to one "the diagnosis was not a proper one and that the operative procedure was not a proper one." As to the second it concluded "her case should have had a D & D prior to surgery plus a Pap smear." On August 30, 1961, the surgical committee on receiving a new case from the tissue and autopsy committee, requested plaintiff to appear before it with respect to the first case mentioned above, and that last referred to.

On September 6, 1961, the two cases were discussed, but plaintiff's presentation of his opinion was cut short by the adjournment of the committee while he was seeking an anatomy textbook. The committee's minutes which were forwarded to the executive committee reflect that the first patient presented classical findings of gallbladder disease. The gallbladder proved normal, as did the liver and pylorus which were the subjects of biopsies. The committee suggested that if the plaintiff had taken procedures—an operative cholangiogram—which he rejected in order not to prolong the surgery, it would have revealed a functioning gallbladder and indicated nonremoval. The second case involved the removal of neck glands which appeared to be calcified. The committee concluded, ". . . in a case of this sort, a specialist in the field of neck surgery should have been called in."

This report was reviewed by the executive committee on September 25,

1961, without action. The basis of the referral of plaintiff's status to the attorney on January 15, 1972, was never fully explained, and it does not appear whether such reference was made, or, if so, what report was rendered.

The last official recorded action appears in the minutes of Dr. Lindner's surgical committee on January 31, 1962. He advised the committee that it was their function to support him in all decisions. The minutes further reflect, "Dr. Lindner announced that Dr. Ascherman could no longer schedule any surgery and that no more beds were to be made available to him in this hospital in consideration both of his past record and a current extremely unfavorable incident involving this hospital and leading to Dr. Ascherman's suspension from the staff of the Franklin Hospital. Dr. Ascherman, while not being actually suspended at this hospital in the light of the possibilities of legal repercussions, will not be allowed to have his staff membership renewed here."

Here again the equivocal reasons given for plaintiff's ouster and the history of the proceedings which were taken, permit the inference that Dr. Lindner and the hospital were exercising their powers other than reasonably and for the public good.

The plaintiff was appointed to the courtesy staff of Hahnemann Hospital for the year commencing March 1, and in 1959 his privileges were renewed March 1, 1960, and March 1, 1961, but he did not use its facilities as extensively as he did those at St. Joseph's Hospital or Franklin Hospital. Its bylaws provided for a staff executive committee, a credentials committee, and a surgical committee. The fiscal year of the hospital ended on February 28, 1962, and in preparation for review and reappointment of staff members a special committee was appointed by the executive committee in January 1962. Although testimony at the trial indicated that a committee at Hahnemann Hospital had reviewed and criticized a surgical case in which plaintiff removed tissue from a patient's neck in April 1961, there was no evidence to show that this matter was ever brought to plaintiff's attention or that prior to February 1962, it was considered by anyone at the hospital as indicating plaintiff should not be reappointed.

On February 7, 1962, plaintiff advised the administrator of the hospital, that he had not been reappointed at Franklin and St. Joseph's Hospitals, and about the same time he made similar disclosures to the defendant Dr. Groper, chief of the medical staff and president of the hospital corporation. Neither suggested that plaintiff had any problems at Hahnemann. Dr. Groper told plaintiff that all of the facts would be evaluated and then the hospital would reach a fair and equitable solution.

When the executive committee met at a luncheon meeting on February 15, 1962, plaintiff's name was on the list of those approved for reappointment by the special committee. The administrator reported his conversation with plaintiff and the executive committee removed his name from the list submitted and ordered his reappointment held in abeyance pending the report of a special committee appointed to check out the reports concerning plaintiff. The defendant Dr. Howard, who has been referred to above as chairman of the credentials committee at Franklin Hospital, was a member of the board of directors and president of the staff executive committee at Hahnemann. He volunteered to ascertain what had occurred at Franklin Hospital, and Dr. Groper undertook to check at Mount Zion Hospital. Dr. Howard testified that he merely reported back that plaintiff's surgical judgment had been found lacking at Franklin Hospital, and that he did not obtain any information concerning the facts upon which Franklin had acted. Dr. Groper learned that plaintiff had been dismissed at Mount Zion Hospital because of alleged unethical conduct and inadequate surgical judgment in the operating room. He did not ascertain or, in any event report, that the incidents giving rise to plaintiff's dismissal at Mount Zion occurred over two years before.

The staff on February 16, 1962, approved the action taken by its executive committee on the previous day, and on February 26, 1962, a joint conference committee and the executive committee of the board of directors of the hospital took similar action. It was thereby established that plaintiff's reappointment would be held in abeyance. There is, however, no record of any report of a meeting at which the results of the investigation were discussed or acted upon by the staff executive committee, or any other duly constituted body of the hospital. Following the February 15 meeting, the administrator advised plaintiff to not hospitalize anymore patients while he was being investigated, and on March 7, 1962, he wrote plaintiff as follows: "In accordance with the direction of the Executive Committee of the Medical Staff of this hospital, please be advised that it is the position of the Executive Committee that no purpose would be served in continuing the investigation or holding a hearing concerning your reappointment to the Medical Staff of this hospital. [¶] As I have already informed you, the Medical Staff held your reappointment in abeyance for the medical year beginning March 1, 1962. This action has now been made permanent, and no reappointment will be made."

The administrator acknowledged that there was a procedure for a hearing when disciplinary action was contemplated against any doctor, but that such procedure only applied to removal during the term of an appointment. It also appeared that any doctor under criticism would be given an

opportunity to explain his side of an issue, and that no such opportunity was ever given to plaintiff in connection with the criticized April 1961 operation. The hospital took the position that the nonreappointment, in removing the plaintiff from the staff, automatically removed any right he might have for a hearing as a staff member. Plaintiff was so advised officially later in the year when he sought a hearing.

Here again the evidence permits the finding that the renewal of the plaintiff's staff privileges was denied in an arbitrary and discriminatory fashion without adequate investigation or consideration.

■■■ Plaintiff had been appointed a member of the staff of French Hospital in 1959, but only used the hospital once and did not apply for reappointment in 1960. In February 1962, after he was aware of the withdrawal of staff privileges at Franklin and St. Joseph's, he applied at French Hospital and was granted temporary staff privileges for a period of 90 days by a letter dated February 23, 1962. Annual appointments at this hospital ran to May 31, and appointments were made by the board of directors on recommendation of the active medical staff which acted through a credentials committee which reported to the active medical staff.

Temporary staff privileges were granted under a provision which read, "The Administrator of the Hospital after Conference with the Chief of Staff shall have the authority to grant temporary privileges to a physician who is not a member of the Medical Staff. The Chief of Staff shall give an authoritative opinion as to the competence and ethical standing of the physician who desires such temporary privileges, and in the exercise of such privileges, he shall be under direct supervision of the Chief of Staff." Dr. Rogers, who was then, and since 1938 had been chief of staff at French Hospital, and who in 1962 was also chief of surgery at the hospital, testified that he did not make any investigation before approving the temporary appointment; that he advised plaintiff to restrict himself to general surgery; that he should have acceptable consultation on any surgical cases in which there was any doubt as to surgery being indicated; and that he should seek assistance from a qualified surgeon on any case appearing to present technical difficulties. So far as appears plaintiff with one exception did consult with Rogers or other doctors as requested. In that case Rogers intervened and plaintiff secured a specialist as suggested by Rogers. A second incident involved a nursing problem in which plaintiff had given an unusual order to remove a patient from a room and put him in a corridor by himself.

Plaintiff's application was referred to the credentials committee which on March 8, 1962, noted, without action, that he had been granted tempo-

rary privileges. Minutes of a medical staff meeting of March 12, 1962, indicate that plaintiff was granted temporary privileges for 90 days pending investigation of his application. According to the administrator of the hospital the credentials committee had about three meetings between March 8 and May 31, 1962, in which it reviewed applications for appointment and reappointment to the staff.

On May 17, 1962, the administrator wrote plaintiff, "After careful consideration and thorough review, the Credentials Committee of French Hospital feels obligated to deny your application for Courtesy Staff privileges on a permanent basis." It was not until May 31, 1962, that the minutes of the credentials committee show that plaintiff and two other applicants "were not recommended for election after careful investigation." The administrator explained that the discrepancy in the dates occurred because Dr. Daniels, the chairman of the credentials committee directed him to send the letter following one of the interim meetings of the credentials committee. Thereafter, the medical staff on June 11, 1962 approved the report of the credentials committee, and the board of directors of the hospital approved the staff recommendations.

The scope of the consideration and review afforded plaintiff is clouded. The administrator, who attended no interim meetings, but only the final meeting of the credentials committee on May 31, 1962, testified that plaintiff's name was brought up, and that the sole matter discussed was his mismanagement of cases at French Hospital without reference to any specific cases. Plaintiff testified, and the administrator corroborated, that no cases of his had been referred to any of the duly constituted review committees of the hospital. The only incidents brought out were those testified to by Dr. Rogers as recounted above. Dr. Rogers testified that he did not discuss plaintiff with anyone from French, Hahnemann or Franklin Hospitals while his application was under consideration, but that he did discuss plaintiff with Dr. Lindner, who as noted above, was chief of surgery at St. Joseph's Hospital. Rogers further stated that he did not know of any case of mismanagement at French Hospital during the temporary appointment, and that as chief of surgery he would have discovered such mismanagement from the records. He also testified that in his opinion the two incidents he noted would not alone have furnished grounds to deny plaintiff's application, and he conceded that "outside investigation" played a role in the final decision. By whom it was made, what was revealed, and to whom were communicated the results of such an outside investigation was never disclosed. Plaintiff's subsequent request for a hearing was denied.

Even though there be no duty to give a hearing with respect to an application, it is questionable whether the procedure followed in this case

was adequate as a matter of law. The discrepancies were certainly some evidence that the hospital acted on less than adequate information.

## IV

Each of the individual doctors who has been joined as part of the hospital defendants assert that the judgment should be upheld as to him because any action on his part was privileged under provisions of section 43.7 of the Civil Code, which became effective September 15, 1961. (See fn. 3 above.) The jury was instructed concerning the conditional privilege granted by section 43.7.[10]

Plaintiff asserts that the section is unconstitutional because in giving to one class—members of duly appointed committees, etc.—a special immunity it violates the due process and equal protection guarantees of the Fourteenth Amendment as applied to an applicant or staff member who is denied or loses privileges on the basis of hearsay information. In the alternative he contends that it cannot apply to proceedings which fail to give the subject the right to a hearing in accordance with minimum requirements of due process of law. Similar arguments were made with respect to the provisions of section 48a of the Civil Code which relieved news media of the liability for general damages for libel unless a retraction were demanded and refused. In *Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121 [216 P.2d 825, 13 A.L.R.2d 252] [app. dism. (1951) 340 U.S. 910 (95 L.Ed. 657, 71 S.Ct. 290)] the court held "the danger of excessive recoveries of general damages in libel actions and the public interest in the free dissemination of news" warranted the legislation (35 Cal. 2d at p. 126.) It also upheld the legislation against the contention that it violated the equal protection provisions of the United States and California Constitutions because it gave the news media special privileges (*id.*, pp. 130-136). It concluded, "We cannot say that in balancing the interests of defamed plaintiffs against the interests of the public in the dissemination of news or the avoidance of the danger of excessive general damages, the

---

[10]This instruction read: "You are instructed that Section 43.7 of the Civil Code provides that there shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any member of a duly appointed committee of a medical staff of a licensed hospital or a professional society for any act or proceeding undertaken or performed within the scope of the functions of any such committee which is formed to maintain the professional standards of the society, if such committee member acts without malice, has made a reasonable effort to obtain the facts of the matter as to which he acts, and acts in reasonable belief that the action taken by him is warranted by the facts known to him, after such reasonable effort to obtain facts. If you find that any of the individual defendants in this case comes within the immunity afforded by Section 43.7 of the Civil Code of this state, then in that event your verdict must be in favor of such individual defendant or defendants."

Legislature reached an unconstitutional compromise in enacting section 48a." (*Id.*, pp. 136-137. See also *County of Los Angeles* v. *Superior Court* (1965) 62 Cal.2d 839, 846 [44 Cal.Rptr. 796, 402 P.2d 868].)

The interest of the public and the hospitals in having competent physicians and surgeons on the hospital staff is obvious. It was, therefore, proper for the Legislature to grant those charged with the investigation of the competence of applicants for membership and of existing members of a hospital staff, the qualified immunity conferred by section 43.7.

 In view of the evidence concerning the actual procedures followed by each of the hospitals, factual questions were raised as to whether any doctor was acting "pursuant to written bylaws," acting "without malice," "made a reasonable effort to obtain the facts of the matter," or acting "in reasonable belief that the action taken by him [was] warranted by the facts known to him after such reasonable effort to obtain facts." Therefore, the judgments in favor of the doctors cannot be sustained as a matter of law on the basis of the provisions of section 43.7.

It has also been recognized that the absolute privilege conferred by subdivision 2 of section 47 of the Civil Code[11] extends to quasi-judicial proceedings and will protect a doctor from liability for a statement made to the attorney of a hospital which is conducting a hearing on the application of a second doctor who is the subject of defamatory matter in such statement. (*Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861, 864-866 [100 Cal.Rptr. 656] [hg. by S.Ct. den.]. See also *Goodley* v. *Sullivant, supra,* 32 Cal.App.3d 619, 623.) In this case, however, the plaintiff is not seeking to recover for defamation. He contends that the defendants caused his ouster and denied him privileges for reasons in no way connected with his professional competence; and that the hospitals and the doctors concerned acted without any proper investigation of his competence. There is, therefore, no cause to invoke the privilege if the quasi-judicial proceedings giving rise to it were never taken. Here again the issue of the application of the privilege depended on the resolution of factual issues and could not be determined as a matter of law.

V

 At the trial the court permitted the hospital defendants to introduce expert testimony concerning the alleged mismanagement of cases by plaintiff. This testimony was predicated upon hospital charts and records

---

[11]Civil Code section 47 provides in pertinent part: "A privileged publication . . . is one made . . . [¶] 2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law; . . ."

which, although they were available, were not shown to have been resorted to at the time the decisions were made with respect to plaintiff's staff privileges. ▮▮▮ It is a general principle of administrative law that discipline meted out to a licensee for alleged improper acts which are not established by the evidence, cannot be upheld because of evidence of other offenses which were not part of the original charge. (See *Lorenz* v. *Board of Medical Examiners* (1956) 46 Cal.2d 684, 687 [298 P.2d 537].) ▮▮▮ The hospital defendants seek to sustain this evidence on the ground that it tends to establish the authenticity of hearsay reports on which some of the moving parties, who failed to investigate, apparently acted. Of course, the best-evidence of the nature and veracity of those reports would have been the informants themselves.

In this case, however, the plaintiff seeks not only a hearing and review of the charges, to which the hospital defendants are apparently ready to concede he is entitled, but also damages for his exclusion and ouster. The public interest indicates that if the plaintiff should have been excluded, he should not be awarded damages because the hospital defendants acted for improper motives. It was, therefore, proper to probe the question of the plaintiff's actual competency as it existed in 1961-1962 at the time the privileges were withdrawn. The jury should have been instructed as to the limited use to be made of this evidence, and to carefully first sift the actual knowledge or lack of knowledge on which the alleged improper exclusions were predicated in line with the principles first referred to in this opinion.

The judgments in favor of the defendants American Society of Internal Medicine, Watts, Whitehall, Direct Wire Telephone Service Co., Novitsky, Webb and American Mutual Liability Insurance Company are affirmed and said defendants shall recover their costs on appeal from plaintiff. The judgments are reversed with respect to the defendants San Francisco Medical Society, Franklin Hospital, French Hospital, Hahnemann Hospital, St. Joseph's Hospital, Butler, Groper, Howard, Jones, Lindner and Monardo and said defendants shall pay one-half of the costs incurred by plaintiff on his appeal.

Elkington, J., and Christian, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.