630 A.2d 1

**Harry A. COOPER, D.O., Appellant,**

v.

**DELAWARE VALLEY MEDICAL CENTER, Bernard Amster.**

Superior Court of Pennsylvania.

Argued Sept. 22, 1992.

Filed June 28, 1993.

Reargument Denied Sept. 10, 1993.

2

4

David L. Pennington, Philadelphia, for appellant.

Brian M. Peters, Philadelphia, for Delaware Valley, appellee.

Before WIEAND, FORD ELLIOTT and HOFFMAN, JJ.

FORD ELLIOTT, Judge:

This is an appeal from the January 3, 1992 order of the Court of Common Pleas of Bucks County, granting the motions for summary judgment of the several defendants, with the exception of the motion of Dr. Bernard J. Amster. We reverse.

The long history giving rise to this appeal must be fully recounted to facilitate a detailed and complete resolution of the issues presently before this court. In faithful adherence to our standard of evidentiary review, we must examine the record in a light favorable to appellant, who is entitled to the benefit of all reasonable inferences.

In 1979, appellant, Harry Cooper, began a four-year residency in orthopedic surgery at Delaware Valley Medical Center (hereinafter "DVMC"). Appellant's residency was performed under the training of Bernard Amster, D.O. It was appellant's testimony that he accepted the residency with the understanding that at its completion, he would join Dr. Amster in his practice and be permitted to treat unassigned emergency room patients. For each year of his residency, appellant executed a contract. However, none of the contracts contain any reference that appellant was guaranteed the privilege of treating emergency room patients upon the completion of residency.

During the third year of appellant's residency, internal problems developed among DVMC's board of directors. A lawsuit was filed by half of the members of the board against Drs. Amster, Berman, and Glass alleging that they had created conflicts to prevent expansion of the hospital and admission to the staff of physicians who would compete in the same practice areas. Drs. Amster, Berman, and Glass consequently filed a countersuit. Both suits were marked settled, and eventually Dr. Amster's faction gained control of the board.

As appellant entered his final year of residency, the new board, under the guidance of Dr. Amster, adopted new Rules

and Regulations for the Division of Orthopedic Surgery. The major impact of the new rules was that, for the first time, DVMC established written eligibility criteria for orthopedists wishing to treat unassigned emergency room patients. Specifically, the new Rules and Regulations for the Division of Orthopedic Surgery, adopted July 30, 1982, established the following four requirements for a doctor seeking to treat unassigned emergency room patients:

(a) An AOA approved internship and an AOA residency;
(b) Be certified in orthopedic surgery by the American Osteopathic Academy of Orthopedics;
(c) Be an active staff physician for at least three years;
(d) He/she must admit to the orthopedic service at least fifty patients [per] year from his/her practice.

On June 30, 1983, appellant successfully completed his residency at DVMC. The completion of appellant's residency was certified by Dr. Amster. Two weeks prior to completing his residency, the DVMC Credentials Committee had recommended appellant for active staff privileges on a six-month probationary basis.

On October 2, 1984, appellant submitted a formal, written request to Dr. Amster to treat unassigned patients in the DVMC emergency room. Dr. Amster failed to respond to appellant's request and thus remained the only orthopedic surgeon eligible to receive unassigned emergency room patients. In February of 1985, appellant sent a letter to the DVMC Medical Executive Committee requesting privileges to treat unassigned emergency room patients. In his letter to the Medical Executive Committee, appellant reaffirmed his position that he was told at the beginning of his residency he would have such privileges if he chose to practice at DVMC. The Medical Executive Committee held a hearing on this matter on March 28, 1985, and subsequently denied appellant's request to treat unassigned emergency room patients because he failed to meet the new criteria.

This series of events led appellant to file a federal lawsuit in 1985 alleging antitrust violations on the part of Dr. Amster

and DVMC. The federal suit was ultimately dismissed when the Honorable J. William Ditter, Jr., determined the matter was not yet ripe for adjudication since appellant had not exhausted all his remedies within the DVMC appellate process. The Third Circuit Court of Appeals affirmed the dismissal of the federal action.

In February 1986, appellant also filed a saving action in state court against DVMC, Dr. Amster, Dr. Newman, Dr. Stepanuk, and Metropolitan Hospital–Parkview Division. The complaint was based on theories of tortious interference with prospective contractual relations, promissory estoppel, fraud, misrepresentation, and breach of implied contract. The state court action, like the federal action, centered around the refusal to grant appellant emergency room privileges at DVMC. After preliminary objections were filed, the trial court granted appellant leave to amend his complaint. The amended complaint named only Dr. Amster and DVMC as defendants.

Before the federal lawsuit had been dismissed, the time arose for appellant's 1986 annual reappointment review for general staff privileges. Dr. Amster informed DVMC's administration that he could not review appellant's credentials because appellant had named him as a party defendant in a federal lawsuit. Consequently, DVMC retained an independent orthopedist, Dr. Keith Harvie, to perform the review.[1] Dr. Harvie's review included interviews with Drs. Amster and Stepanuk, both of whom were defendants in appellant's lawsuits, and a full interview with appellant. On November 25, 1986, the DVMC Credentials Committee voted to limit appellant's general staff privileges, in accord with Dr. Harvie's September 22, 1986 report.

1. Dr. Harvie's selection was based on the following criteria: "[1] complete objectivity and lack of bias in assessing the plaintiff; [2] no prior personal or professional contact with the defendant hospital or its medical staff members; [3] experience in determining clinical privileges; [4] AOA Board Certification; and [5] teaching experience." (Trial court opinion, 4/8/92 at 8–9.) Dr. Harvie was chosen from a list prepared by the American Academy of Osteopathic Orthopedic Surgeons pursuant to these qualifications.

Appellant then proceeded to exhaust all of DVMC's internal administrative remedies. However, the decision of the Credentials Committee remained unchanged. Accordingly, on March 18, 1988, appellant instituted a civil action in the Court of Common Pleas of Philadelphia County against Dr. Amster, DVMC, and thirty-six others. This state court action alleged federal and state due process and equal protection violations, a violation of state anti-trust laws, tortious interference with business relationships, intentional infliction of mental and emotional distress, libel and slander, breach of contract, and a violation of the Health Care Facilities Act, 35 Pa.S.A. § 448. The counts alleging violations of state anti-trust laws and the Health Care Facilities Act were dismissed pursuant to an order sustaining DVMC's preliminary objections.

On July 2, 1990, the 1988 Philadelphia County action was transferred to Bucks County and coordinated with the previously filed 1986 state saving action. The new coordinated action was listed with a 1990 Bucks County docket number and captioned accordingly.

In November 1991, DVMC and Dr. Amster filed separate Motions for Summary Judgment. In a single order, the Honorable Edward G. Biester, Jr., granted the motion of DVMC and the thirty[2] individual defendants as to all causes of action in both of appellant's state court complaints. The trial court concluded that it was precluded from engaging in a substantive review of the hospital's staffing decisions by reason of this court's holding in *Rosenberg v. Holy Redeemer Hospital,* 351 Pa.Super. 399, 506 A.2d 408 (1986). Furthermore, the trial court found that the thirty individual defendants were immune from liability pursuant to the provisions of the Pennsylvania Peer Review Protection Act, 63 P.S. § 425. With respect to Dr. Amster's motion, the trial court granted summary judgment for Dr. Amster on appellant's claims under the Fourteenth Amendment; for intentional infliction of

---

**2.** Originally, there were thirty-six individual defendants apart from DVMC and Dr. Amster. However, after several petitions for voluntary discontinuance, only thirty such defendants remained at the time summary judgment motions were filed.

emotional distress; and for defamation. Dr. Amster's motion was denied with respect to all other claims. This timely appeal followed.

Appellant presently raises four issues for our consideration:

I. Whether the trial court erred in failing to recognize that the decision in *Rosenberg v. Holy Redeemer Hospital* is inconsistent with the intent of the Pennsylvania Legislature to preserve a private cause of action against those who abuse the Peer Review Process?

II. Whether *Rosenberg v. Holy Redeemer Hospital* precludes plaintiff from maintaining causes of action other than a violation of his due process and equal protection rights under the Fourteenth Amendment?

III. Whether the Pennsylvania Peer Review Protection Act protects parties from civil liability that act with malice and fail to exercise due care?

IV. Whether the facts, taken in the light most favorable to Dr. Cooper, support his causes of action and therefore should have precluded entry of summary judgment in favor of defendants?

Essentially, appellant's four issues focus upon two primary areas of concern; an interpretation and application of *Rosenberg v. Holy Redeemer Hospital, supra,* and an interpretation and application of the immunity provisions of the Peer Review Protection Act.

## THE APPLICATION OF ROSENBERG V. HOLY REDEEMER HOSPITAL

Initially, we will consider the *Rosenberg* case and the extent to which it is presently applicable. The trial court relied upon *Rosenberg* in deciding that summary judgment was appropriate as to DVMC. There is a great difference of opinion between the parties as to the extent of *Rosenberg*'s applicability. Appellees, echoing the analysis offered by the trial court, maintain that *Rosenberg* absolutely prohibits judicial interference in a private hospital's staffing process regardless of the

cause of action pursued. Conversely, appellant contends that the trial court erroneously interpreted *Rosenberg* too broadly. According to appellant, *Rosenberg* was never intended as a ban on any lawsuit evolving from a private hospital's staffing review process. We find that the correct interpretation lies somewhere in the middle of these two extreme positions.

In order to assess the validity of these divergent arguments, it is first necessary to review *Rosenberg,* itself. In September 1980, Dr. Rosenberg applied for appointment to the active medical staff at Holy Redeemer Hospital. The Hospital's Board of Directors subsequently notified Dr. Rosenberg of its decision to deny his application. Dr. Rosenberg exhausted the administrative appeal process, but to no avail. Ultimately, Dr. Rosenberg filed suit against the Hospital seeking *injunctive* relief from the decision to deny him staff privileges. Initially, Dr. Rosenberg prevailed on his summary judgment motion. He was able to successfully challenge the procedures utilized by the Hospital in considering his application for a staff appointment. The matter was remanded to the Hospital's Appellate Review Committee with instruction that Dr. Rosenberg be afforded a *de novo* hearing. The Hospital complied with the remand order but still decided to deny Dr. Rosenberg's application. Dr. Rosenberg then filed a Petition for Supplemental Injunctive Relief. The Hospital countered with a Motion for Summary Judgment, arguing that the trial court, as a matter of law, lacked authority to review the substance of a hospital staffing decision. The trial court agreed and granted the Hospital's motion. Dr. Rosenberg appealed that decision to this court.

The Superior Court, in resolving the claims on appeal, adopted in large measure the opinion of the trial court, Judge Anita Brody. Characterizing Dr. Rosenberg's claims as constitutional due process claims, the trial court had determined that it was without authority to review the substantive staffing decisions of a private hospital because the "due process clause 'applies only to 'state action' and not to private conduct.' " *Rosenberg* at 405, 506 A.2d at 411. Judge Brody then analyzed whether Holy Redeemer met the test for a quasi-public

hospital and determined it did not. "Since the test for quasi-publicness has not been met, we as did the Superior Court in *Miller* [*v. Indiana Hospital,* 277 Pa.Super. 370, 419 A.2d 1191 (1980)] 'decline to judge appellant's claims of unfairness against the due process clause.'"[3] *Rosenberg* at 406, 506 A.2d at 412. It was on the basis that a due process claim could not be made out that the trial court was without authority to act in *Rosenberg* and it is on this basis that its decision was affirmed.

As an additional rationale for denial of relief, the trial court opined as follows:

It should be noted additionally that there is no precedent in Pennsylvania case law for the substantive review of a private hospital's hiring decisions. While several states have held that hospitals have a fiduciary duty to the public which permits some degree of judicial review of those institutions' decisions, the majority of jurisdictions hold that staffing decisions are within the hospital's discretion and are not subject to judicial review.

The view that private hospital's hiring decisions should not be subject to judicial review remains sound. The administrative officers of a private institution are presumed to operate in the best interest of that institution. A court should be loathe to substitute its judgment on a matter as intrinsic to the hospital as is a staffing decision. Absent some legislative command to the contrary, the courts of this Commonwealth will not interfere with the substantive decisions of private hospitals, but will only ensure that such decisions are made pursuant to the proper procedures.

This Court, then, finds that as a matter of law it is without the authority to review the decision of Holy Re-

---

**3.** In response to Judge Brody's trial court opinion, Rosenberg argued that he would concede that Holy Redeemer was neither a public or quasi-public hospital but rather was a public fiduciary. This court rejected this additional theory of relief on the grounds that judicial review is precluded unless it can be established that the hospital exercised a monopoly position in a particular geographical area. The *Rosenberg* trial court also denied relief on a claim presented by Dr. Rosenberg which alleged a violation on the basis of Pennsylvania Department of Health Regulations.

deemer Hospital to deny Dr. Rosenberg's application on a substantive level.

*Id.* at 407, 506 A.2d at 412 (citations omitted).

It is on this statement of policy that appellees advocate a broad reading of *Rosenberg* so as to preclude any suit against a hospital which calls into question the substantive review of a staffing decision. However cogent the analysis in *Rosenberg* may be, as precedential authority it does not stand for the proposition which appellees espouse—that no action at law or equity may be brought resulting from the staffing decision of a private hospital. We agree with appellant that *Rosenberg* is limited to the context in which the issues were decided therein, and this court did nothing to enhance or expand upon Judge Brody's analysis.

Instantly, appellant had alleged in Count I of his complaint that DVMC, as a quasi-public institution, had violated his due process and equal protection rights under the Fourteenth Amendment in the manner in which it restricted his staff privileges. Clearly, a review of Judge Biester's opinion establishes that he granted summary judgment in favor of DVMC on the basis that the hospital was a private institution and therefore no state action was involved in its decisions. Additionally, he concluded that DVMC did not hold a monopoly in the area such that it could be characterized as quasi-public.

Hence, the trial court, in adherence to the mandate in *Rosenberg*, determined that he was without jurisdiction to review the actions of DVMC within the context of appellant's due process claims. Appellant has not appealed the dismissal of Count I of his complaint. However, appellant argues that, to the extent the trial court granted summary judgment to DVMC on all remaining counts under the theory of *Rosenberg*, it acted too broadly. We agree.

In *Rosenberg* the plaintiff was seeking an injunction to have the actual staffing decision changed. Not only should a court be loathe to act to substitute its judgment in private corporation matters, but it generally lacks jurisdiction to do so. A physician aggrieved by the personnel or administrative

decisions of a private hospital is in no different a position than an employee of a private corporation and cannot appeal to the courts to force reversal of those decisions. Accordingly, to that end, the holding from *Rosenberg* is undeniably sound. However, the legitimate concerns requiring the result in *Rosenberg* are not present in this case.

Unlike *Rosenberg,* the instant case is primarily an action at law, seeking damages under various tort and contract theories.[4] Presently, appellant is seeking monetary damages for the harm caused to his medical reputation and business interests by the improper use of the proceedings. *Rosenberg* cannot be used as a shield to prohibit any and all lawsuits arising from the hospital staffing process. *Rosenberg* cannot be interpreted to prohibit a doctor from filing suit based on legitimate contract and tort theories. The thrust of appellant's suit is to recover damages for alleged civil wrongs. The fact that they occurred in the peer review setting does not automatically preclude appellant from seeking redress. However, as will be addressed in our analysis of the application of the Pennsylvania Peer Review Act, there may be other fundamental limitations on the type of redress appellant, as an aggrieved physician, is entitled to pursue.

## THE APPLICATION OF THE PEER REVIEW ACT

Following its grant of relief to DVMC on all counts on the authority of *Rosenberg,* the trial court then went on to grant summary judgment of all claims against the additional individual appellees on the basis of the immunity provisions of the Pennsylvania Peer Review Protection Act (hereinafter "The Act").

4. Appellant's 1988 Philadelphia County Complaint was filed as an equity action. However, the complaint primarily seeks monetary damages for the alleged tortious conduct of the various defendants. In the alternative, the 1988 complaint requests injunctive relief. However, the request for injunctive relief was denied by order of the Court of Common Pleas of Philadelphia County on December 16, 1988. Thus, by the time this action was coordinated with the 1986 action and transferred to Bucks County, only monetary relief was being sought. No equity issues have been raised before this court.

■ There is little question, and appellant does not argue to the contrary, that the acts upon which liability is predicated against appellees all arise within the context of the Peer Review Process. We agree with appellee that an abuse of The Act does not create a separate cause of action. However, malicious acts committed in the context of peer review can abrogate a participant's immunity and expose that person to liability pursuant to various other causes of action. Appellant has alleged that appellees abused this process and he suffered various tortious and contractual injuries as a result. Therefore, if appellant is to pursue his claims against the various appellees, he must pierce the immunity provided by The Act.

■ The Act was promulgated to serve the legitimate purpose of maintaining high professional standards in the medical practice for the protection of patients and the general public. The Act represents a determination by the Legislature that, because of the expertise and level of skill required in the practice of medicine, the medical profession itself is in the best position to police its own activities. One commentator has set out the need for such legislation generally.

It is beyond question that peer review committes [sic] play a critical role in the effort to maintain high professional standards in the medical practice. The function they serve in protecting patients and the general public from less than competent physicians is of exceeding importance as there is no doubt that an incompetent physician can make mistakes costing human lives. On the other hand, hospitals and their peer review committees are expected to honor the rights of the private physician. The suspension of a physician's hospital staff privileges can have a devastating effect on his practice, particularly if there are no other hospitals which could conveniently serve the needs of the physician's patients. In addition, the suspension of a physician's staff privileges at one hospital may jeopardize his status at another hospital, making it difficult, if not impossible, to obtain staff privileges at a new hospital.

Thus, members of peer review committees are confronted with the task of reconciling the interests of the physician

under review with the interests of the hospital and its patients. It is not an enviable position, especially when one considers that peer review participation often entails long hours of stressful review work, no compensation, no thanks, and frequent criticism.

The individual members of peer review committees are increasingly becoming the targets of legal activity directed against them by disgruntled doctors whose staff privileges have been suspended upon the recommendation of the committee. Although physician rights clearly need to be protected, the effectiveness of medical peer review committees could be seriously hampered if committee participants were subjected to a barrage of suits resulting from their committee evaluations.

Jorstad, *The Legal Liability of Medical Peer Review Participants for Revocation of Hospital Staff Privileges,* 28 Drake L.Rev. 692, 693 (1978–79) (footnotes omitted).

In an effort to foster peer review participation, the Legislature enacted the immunity and confidentiality provisions of The Act:

The Peer Review Protection Act, through grants of immunity from liability, *see* 63 P.S. § 425.3, and of confidentiality, *see id.* § 425.4, encourages 'review organizations,' engaged in 'peer review,' 'to gather and review information relating to the care and treatment of patients for the purpose of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care.'

*Id.* § 425.2; *see also Robinson v. Magovern,* 83 F.R.D. 79, 87 (W.D.Pa.1979). Through these immunity and confidentiality provisions, then, the Legislature has sought to foster free and frank discussion by review organizations. *Id.*

*Steel v. Weisberg (I),* 347 Pa.Super. 106, 110, 500 A.2d 428, 430 (1985).

██ However, while the Legislature recognized the need for free and frank discussion, it also recognized that such

discussion must represent fair comment and be suited to the fulfillment of the purposes of The Act. Thus, while The Act provides protection from legal liability to those who participate in this peer review process, such protection is not absolute. *See Steel v. Weisberg II,* 368 Pa.Super. 590, 534 A.2d 814 (1987), *appeal dismissed,* 525 Pa. 503, 582 A.2d 648 (1990).

The grant of immunity in the Act is set forth in section 425.3, which states:

### § 425.3. Immunity from liability

(a) Notwithstanding any other provision of law, no person providing information to any review organization shall be held, by reason of having provided such information to have violated any criminal law, or to be civilly liable under any law, unless:

(1) such information is unrelated to the performance of the duties and functions of such review organization, or

(2) such information is false and the person providing such information knew, or had reason to believe, that such information was false.

(b)(1) No individual who, as a member or employee of any review organization or who furnishes professional counsel or services to such organization, shall be held by reason of the performance by him of any duty, function, or activity authorized or required of review organizations, to have violated any criminal law, or to be civilly liable under any law, provided he has exercised due care.

(2) *The provisions of paragraph (1) of the subsection shall not apply with respect to any action taken by any individual if such individual, in taking such action, was motivated by malice toward any person affected by such action.*

1974, July 20, P.L. 564, No. 193, § 3, imd. effective.

63 P.S. § 425.3 (emphasis added).

It is on Subsection (b)(2) that appellant seeks to abrogate appellees' immunity under The Act.

■ Initially, we note that the immunity provision set out in (b)(1) and its exception set out in (b)(2) of The Act is limited by its terms to *individuals* who participate in the review process. The Definitions section of the Act, § 425.2, defines "Peer Review" to mean the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other health care providers. The Act then further defines "Professional health care providers" to include individuals or organizations.

'**Professional health care provider**' means individuals or organizations who are approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth, including, but not limited to, the following individuals or organizations:

(1) A physician.

(2) A dentist.

(3) A podiatrist.

(4) A chiropractor.

(5) An optometrist.

(6) A psychologist.

(7) A pharmacist.

(8) A registered or practical nurse.

(9) A physical therapist.

(10) An administrator of a hospital, a nursing or convalescent home, or other health care facility.

(11) A corporation or other organization operating a hospital, a nursing or convalescent home or other health care facility.

63 P.S. § 425.2.

Clearly, the Legislature recognized that hospitals, as organizations, are involved in the Peer Review Process. However, by limiting the immunity to individuals, the Legislature appears to have specifically declined to grant the immunity protection of the Act to the organizational health care provider

itself.[5] Therefore, appellant's claims as against DVMC are not precluded by The Act.

 We now review the trial court's grant of summary judgment with respect to the other individual appellees. The trial court, in granting summary judgment, specifically found that there was "no genuine issue of material fact which would support either a finding that any of these defendant[s] acted maliciously or failed to exercise due care with respect to any of the review procedures in question." Trial court opinion, 4/8/92 at 19. On the record before this court, we cannot completely agree.

When considering a challenge to an order granting a summary judgment motion, our standard of review is well-settled:

> Summary judgment is only proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The movant must demonstrate that no genuine factual issues exist and that he is entitled to judgment as a matter of law. An appellate court must examine the record in the light most favorable to the non-moving party, who is entitled to the benefit of all reasonable inferences. All doubts must be resolved against the movant, as summary judgment is only proper in the clearest case. Nonetheless, the grant of summary judgment will only be reversed for an error of law or clear abuse of discretion.

*Carns v. Yingling*, 406 Pa.Super. 279, 282, 594 A.2d 337, 339 (1991).

In order for appellant to proceed on various causes of action against the individual appellees based on their participation in his review process, appellant must be able to establish that

5. Contrast Pennsylvania's Peer Review Protection Act with Michigan's which specifically provides immunity to any person, *organization* or *entity* participating in peer review activity, and also provides that said immunity shall "not apply to a person, *organization*, or *entity* that acts with malice." M.C.L. § 331.531; M.S.A. § 14.57(21) (emphasis added).

their actions toward him were motivated by malice.[6]

■ The Peer Review Protection Act does not, itself, provide a definition of "malice." However, other jurisdictions which have similar immunity provisions in peer review statutes have defined this term. We turn to one such jurisdiction for guidance. The Arizona Court of Appeals, in *Scappatura v. Baptist Hospital,* 120 Ariz. 204, 584 P.2d 1195 (1978), defined "malice," in the context of peer review activities, as " 'a wish to vex, annoy or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law.' ... '[M]alice' and 'bad faith' should, therefore, in this context mean a primary purpose other than the safeguarding of patients." *Id.,* 584 P.2d at 1201. We find this definition appropriate to our purposes and consistent with the general language of the Pennsylvania Act. Section 425.3(b)(2) of The Act affords immunity to individuals involved in peer review because such freedom from liability promotes the candor and cooperation of the participants in the process. Such an atmosphere serves the fundamental purposes of The Act, the safeguarding of patients and improving the quality and cost of medical care. The definition of malice proffered by the *Scap-*

---

6. In numerous other jurisdictions having similar peer review protection statutes, civil suits have been successfully litigated under the same causes of action advanced by appellant in this case. *See* Jorstad, *The Legal Liability of Medical Peer Review Participants for Revocation of Hospital Staff Privileges,* 28 Drake L.Rev. 692 (1978–79); Oliverio, *Hospital Liability for Defamation of Character During the Peer Review Process: Sticks and Stones May Break My Bones, but Words May Cost Me My Job,* 92 West Virginia L.Rev. 739 (1990). In both of these articles, the authors provide numerous examples of lawsuits brought as a result of the peer review process. The Jorstad article subdivides the actions based upon causes pled into the following categories: defamation, antitrust, interference with practice of profession, breach of contract, tortious interference with contractual relations, and negligence. These are the same causes raised by appellant in the present action. Furthermore, other jurisdictions which have recognized such civil suits include: California, Michigan, New Jersey, Missouri, Tennessee, Alabama, Minnesota, Illinois, West Virginia, and numerous federal district courts. The prevailing theme in all these cases is that the mere existence of a peer review immunity statute does not preclude, as a matter of law, civil litigation against review committee members or the hospital. *See, e.g., Ascherman v. San Francisco Medical Society,* 39 Cal.App.3d 623, 114 Cal.Rptr. 681 (1974).

*patura* court embraces those very concerns. It allows for the potential liability of participants in peer review only when their actions toward another are motivated by concerns other than patient safety and quality of care. Accordingly, the definition of malice established in *Scappatura* is consonant with the overall purposes of the Pennsylvania Act and with the limited culpability which the Legislature envisioned in drafting the provision of 425.3. However, we emphasize that this definition of malice is relevant only to the abrogation of immunity from suit and does not in itself form a basis for imposition of liability on an underlying claim.

Bearing this definition in mind, a review of the record demonstrates that genuine issues of fact existed as to whether the conduct of at least a limited number of appellees was motivated by such malice, and therefore, The Act's protections would not apply. For example, in opposition to the summary judgment motion, appellant offered the deposition testimony of Gary Steinberg. Mr. Steinberg was the C.E.O. at Delaware Valley Medical Center from August 1983 through September 1985. During that period, Mr. Steinberg attended many committee meetings, including medical executive committee and credentials review committee meetings. Mr. Steinberg testified that the new rules and regulations adopted for the orthopedics department were not done in the best interest of the hospital, but more for the self-interest of the department members. Mr. Steinberg further testified that certain departments in the hospital, including orthopedics, were making staffing decisions based on self-interest concerns, rather than in the best interest of the hospital, and, in turn, ultimately the patients. Mr. Steinberg specifically identified several of the appellees as being motivated by concerns other than for the patients when making staffing decisions. He stated that the desire to limit competition motivated staffing decisions more often than the concerns of the patients and community.

Appellant also offered the deposition testimony of Dr. Jeffrey Lindenbaum. Dr. Lindenbaum has held staff privileges at DVMC since 1976 and has served in numerous administrative capacities as well. Dr. Lindenbaum has served on the

Board of Directors; as a member of the Medical Executive Committee; as the Chairman of Quality Assurance; as Co-Chairman of the Intern and Resident Committee; and as Chairman of the General Practice Department.

When asked about committee meetings involving staffing decisions concerning assignment of Emergency Room patients, Dr. Lindenbaum testified that several of the appellees discussed changing the criteria for Emergency Room call duties for the specific purpose of making it much more difficult for new doctors to qualify to receive unassigned Emergency Room patients. Dr. Lindenbaum further testified that the committee members advocating the changes were from departments where residents were completing training and going into practice in competition with the staff doctors. Dr. Lindenbaum identified the Department of Orthopedics as one such department.

Finally, appellant presented the deposition testimony of Dr. Leonard Smith, one of the founders of DVMC. Dr. Smith testified that it was his belief that appellant posed a real competitive threat to Dr. Amster. Furthermore, Dr. Smith stated that on at least one occasion he heard Dr. Berman [one of the appellees herein] state, in relation to appellant, "We worked too hard to get where we are today and we're not going to share it with anybody." (Smith Deposition at 19.)

 Reviewing the deposition testimony of these three witnesses, and considering the record in a light most favorable to appellant, there are genuine issues of fact concerning whether the conduct of at least some of the remaining appellees, relative to appellant's peer review, meets the definition of malice as set out above. We are equally well aware that this deposition evidence seems to indicate that it was a small group whose actions were so motivated. Yet, that group is not readily identifiable based on the record before this court. Therefore, in consideration of our standard of review and because the trial court granted blanket judgment as to all appellees on the same basis, we are constrained to vacate the

grant of summary judgment as to all the individual appellees on appeal.

In light of the necessity of a remand, we are compelled to emphasize appellant's burden. The Legislature's clear purpose in enacting the Peer Review Act was to protect peer review participants not just from liability but also from becoming involved in litigation at all. This purpose would be defeated if mere bald allegations or speculations about malicious intent were sufficient to pierce the immunity of The Act. A party seeking to circumvent the bar of The Act must set out his cause with specificity. It is precisely this standard which will deny substantial relief to appellant on remand. In his amended complaint, appellant has included most of the individuals who participated at any level in the challenged review process. The averments regarding most of these participants named by appellant are non-specific and fall under a general conspiracy theory. Such vague allegations are insufficient as a matter of law to pierce the protection of immunity afforded by The Act.

Looking at appellant's complaint, his underlying premise regarding malice is that the instituting of a new set of credentialing criteria by the hospital and its board of directors was done solely to enhance their own economic self-interest. Consequently, when these criteria were utilized in his peer review process to find him wanting, it was a malicious abuse of the peer review process. Clearly, appellant's claim relates to specific individuals who had some input in the development of the new credentialing criteria. Therefore, we agree with the trial court that to the extent other participants in the peer review process merely utilized the adopted set of criteria to assess appellant's credentials, they were engaging in proper and protected peer review activity. Such activity will, and should, remain immune from civil liability.

On remand, the trial court should re-consider the summary judgment motion, and hold additional hearings, to identify those defendants who should properly be removed from this case. Bearing in mind our stated definition of "malice," the

trial court is instructed to determine as to which specific defendants factual disputes concerning "malice" exist. We add that this opinion decides only the issue of immunity and does not preclude the court's consideration of other defenses or privileges to appellant's claims.

 In the context of his argument concerning the proper interpretation of the Peer Review Protection Act, appellant notes that his attempts at building a case have been thwarted by stifling discovery orders of the trial court. Appellant maintains that the trial court has improperly relied upon the confidentiality provision, section 425.4, of the Act to preclude him from engaging in meaningful discovery. We disagree.

Unfortunately, appellant fails to refer us to any specific instances where he was improperly prevented from discovering relevant material. However, our independent, thorough review of the record reveals only three instances where the trial court issued orders concerning discovery. Instantly, we must note that it appears from the record that appellant was entitled to discover all material pertaining to his own peer review procedures. The material which is the subject of the protective orders is not directly related to appellant's peer review activity. For instance, appellant filed a Motion to Compel several peer review members to answer two types of questions which they had uniformly refused to answer during their deposition. One type involved general inquiries as to whether any other doctor or resident at DVMC had had their privileges restricted during the period from 1983 to 1987. The second type of questions involved whether Dr. Amster had ever had his qualifications considered and/or restricted.

The trial court issued an order prohibiting such inquiries. We see no error in such a ruling. Issues surrounding the confidentiality provision of the Act have most often been raised with respect to medical malpractice cases. Plaintiffs in such cases often seek to discover peer review information concerning the defendant doctor. In addressing such issues, this court has consistently held that while a medical malpractice plaintiff is entitled to his own medical records, he is

precluded from discovering hospital peer review matters not reasonably associated with his cause of action, including complaints against defendant doctor by other patients. *See Sanderson v. Frank S. Bryan, M.D. Ltd.,* 361 Pa.Super. 491, 522 A.2d 1138 (1987). We see no reason to differentiate when the plaintiff is a doctor allegedly aggrieved by the peer review process. Appellant was not precluded from asking any questions or discovering any material concerning his own peer review activity. It was only when appellant sought to delve into the peer review activity of others that doctors being deposed refused to answer. Furthermore, the trial court's protective order only prohibits such general inquiries and apparently has not hampered discovery in any other way. In order to preserve the integrity and confidentiality of the peer review process, we agree with the trial court in issuing such a ruling.

The third discovery order concerns a report issued by The Hunter Group, a hospital consulting company. The protective order prohibiting discovery of this report does not specifically refer to the confidentiality provision of the Act as a reason for issuing the order. Rather, the trial court concludes that the bulk of the report consists of opinions which are not discoverable. Again, we find no reason to dispute this conclusion. However, neither party has engaged in any argument concerning this issue, and thus it would be premature to engage in protracted analysis concerning the discoverability of this matter at this point.

In sum, however, we cannot agree that appellant's discovery has been so limited as to preclude him from establishing issues of fact concerning malice being the motivating factor behind his peer review process. Obviously, based upon our resolution of this case we have concluded from the deposition testimony of record that there exists sufficient question of fact such that the grant of summary judgment as to all appellees was improper. It only remains for the trial court to conduct hearings to properly limit the case to those individual defendants who are truly at the heart of these factual questions.

 Finally, appellees argue that the trial court's decision must be affirmed since appellant failed to challenge the trial court's ruling that appellees were entitled to immunity pursuant to the terms of the Hospital Medical Staff Bylaws. Again, we disagree. The trial court, in granting the summary judgment motion, only discussed the *Rosenberg* case and the immunity provisions of the Peer Review Protection Act as providing the basis for its decision. The immunity section of the Hospital Bylaws was only mentioned once in the trial court's opinion, and then only in conjunction with the Peer Review Protection Act. No discussion was offered by the trial court on the Hospital Bylaws as providing the basis for granting summary judgment. Furthermore, the immunity provision in the Bylaws is identical to that in the Peer Review Protection Act, in that no immunity is provided for actions motivated by malice. Accordingly, the arguments presented by appellant as to the Peer Review Protection Act would apply equally well to the Hospital Bylaws' immunity provision. Furthermore, our resolution of the Peer Review Protection Act issue also applies to the immunity provided for under the Hospital Bylaws. Thus, we do not agree with appellees that we must affirm the trial court because appellant failed to specifically address this issue.

Order and judgment reversed. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

WIEAND, J., files a concurring statement.

WIEAND, Judge, concurring:

I concur in the result. Although there may well be members of the peer review process, including the Delaware Valley Medical Center itself, who will eventually be entitled to summary judgment, the trial court's present order is premature. Therefore, I agree that the case must be remanded for further proceedings.

In doing so, I find it unnecessary to advance an all-inclusive definition of "malice" as that term has been used in the Peer

26

Review Protection Act of July 20, 1974, P.L. 564, as amended, 63 P.S. § 425.1 et seq. I also find it unnecessary, for purposes of deciding the present appeal, to hold that the Peer Review Protection Act provides no protection for hospitals which have installed and relied upon the peer review process. It is enough that on the record now before this Court it cannot be determined as a matter of law that one or more of the named defendants did not act to preserve the "turf" of Dr. Amster rather than in the best interests of the hospital and its patients.